Richard HINOJOSA, Appellant,

v.

The STATE of Texas.

No. 72932.

Court of Criminal Appeals of Texas.

Oct. 27, 1999.

George Scharmen, San Antonio, for appellant.

Kevin Patrick Yeary, Asst. Dist. Atty., San Antonio, Matthew Paul, State's Atty., Austin, for the State.

## *O P I N I O N*

HOLLAND, J., delivered the opinion of the Court in which MCCORMICK, P.J., MEYERS, J., MANSFIELD, J., KELLER, J., PRICE, J., WOMACK, J., and KEASLER, J., joined. JOHNSON, J., concurred in the result.

Appellant was convicted of capital murder on July 21, 1997. *See* TEX. PENAL CODE ANN. § 19.03(a). Pursuant to the jury's answers to the special issues set forth in articles 37.071 §§ 2(b) and 2(e) of the Texas Code of Criminal Procedure, the trial judge sentenced appellant to death. *See* Art. 37.071 § 2(g).[1] Direct appeal to this Court is automatic. *See* Art. 37.071 § 2(h). Appellant raises eight points of error. We will affirm.

### *SUFFICIENCY OF THE EVIDENCE*

■ In his fourth point of error, appellant challenges the factual sufficiency of the evidence to support his conviction. The evidence shows that on May 9, 1994, Terry Wright, a 29–year–old manager of a dentist office, had made a date to see her boyfriend, Charles Miller, after work. They were unable to meet, however, because Miller had to work late and she had a late meeting. Miller called Wright at her home around 11 p.m. She had just returned from work and sounded tired

---

1. Unless otherwise indicated, all future references to Articles refer to Code of Criminal Procedure.

from working all day. That was the last time they spoke.

Wright did not show up for work the following morning. Upon hearing this news, Wright's father went to her house to investigate. The front of Wright's house was completely caged by burglar bars. With a spare key, Wright's father unlocked the gate and the front door. The house was in disarray, particularly Wright's bedroom. Wright's nightgown, torn at the straps, lay on the floor. The cord to an oscillating fan was cut. Numerous items had been thrown around the room, and it appeared that a jewelry box had been rummaged through. Outside, police discovered that the phone lines on the side of the house had been severed. Apparently, the perpetrator gained entry by climbing up the burglar bars onto the roof, lowering himself into an enclosed garden atrium,[2] and throwing a flower pot through the atrium window into the dining room. Police found mud on the burglar bars, a footprint in the mud inside the atrium, and muddy footprints inside the house leading from the dining room into Wright's bedroom.

At eight o'clock that same morning, police found Wright's abandoned black Beretta car near the intersection of Sulphur Springs Road and Loop 410.[3] A trail of transmission fluid guided police from the car to a dirt road off the freeway where a metal pipe protruding through the mud apparently severed the car's transmission line. With the assistance of a K-9 unit, police found Wright's nude body, which had been covered with grass, in a nearby field. Wright had been stabbed 11 times in the chest and back, causing her death. Blood splattered on vegetation indicated that Wright was still alive when she arrived at the field.

Vincent DiMaio, the medical examiner, testified that the presence of sperm on vaginal swabs taken from the victim indicated that she had sexual intercourse within 24 hours of her death. According to the State's DNA expert, only 1 in 19,900,000 randomly selected people of appellant's racial classification group would match the DNA profile of the sperm collected on the vaginal swab. Appellant possessed a DNA profile that matched the sperm taken from the victim.

Near the location where the victim's body was located, police found a footprint identical to the one found in the atrium. According to a Fila brand shoe representative, the prints were made by a leather Fila "Slant Shot" tennis shoe, style number 1-T32-0517. The Slant Shot was first distributed in January 1994 and was a "low seller," comprising only one percent of Fila shoe sales in North America. Appellant's ex-wife[4], Rebecca Alfaro, purchased a pair of size 10 or 11 white Fila tennis shoes for appellant and a couple of months later bought the same style of shoes for herself at a different store. She stated at trial that the soles of appellant's shoes were the same as the soles of her shoes. The soles of Alfaro's shoes were identical to the prints found at the crime scenes, except that the prints were the size of a man's shoe. When police began asking about appellant's shoes, Alfaro looked for the shoes but could not find them. Appellant offered his wife several excuses for why the shoes were missing: maybe his father accidentally threw them away, maybe a dog carried them away, or maybe somebody stole them.

Evidence showed that appellant, his father, wife, sister, brother-in-law, and sister's children lived next door to Wright[5] in

2. The atrium was not readily visible from the street.

3. The car was found about one and a half miles from Wright's neighborhood.

4. Rebecca Alfaro and appellant were married at the time of the offense but divorced sometime before the trial.

5. One of appellant's sisters, Irene Hernandez, was the prior occupant of Wright's house, and

appellant's father's house. On May 9th, appellant returned home from work around 11 p.m—close to the same time as Wright. According to family members, appellant had developed a persistent, hacking cough from years of heavy smoking. Lisa Pecina, appellant's sister, awoke around 1 a.m. and could hear appellant coughing until about 2:30 or 3:00 a.m. Two dogs in the backyard of appellant's father's house normally barked at everybody, including appellant. But Pecina did not hear them bark that night. Pecina also did not see anyone drive up their street that night.

Laurie Lowry, who lives in the house 70–90 feet directly behind Wright's, was awake feeding her newborn baby between 2:00 and 3:00 a.m. on the night of the murder. Through the closed blinds in Wright's bedroom, she could see the silhouettes of a woman, a big muscular man with a bushy ponytail, and a shorter man with spiked hair. Lowry saw a lot of movement in the room, and it appeared that the three were dancing.[6]

Dwayne Cann worked the night shift at a company near Old W.W. White Road and Loop 410. At around 3 to 4 a.m. on May 10, Cann was walking from one building to another when he heard a loud thumping sound. Near the 410 overpass, he saw two Hispanic males working on a black Beretta. One man with a ponytail[7] was looking under the hatchback,[8] and another man was lying on the ground, pounding on the underneath side of the car. Pablo Villegas, a taxi driver, testified that he was dispatched to the intersection of Sulphur Springs Road and Loop 410 sometime early that morning. He picked up two Hispanic males who paid him between $380 and $400 to take them to Dallas.

Appellant's father woke appellant between 5:30 and 6:00 a.m. on May 10th to get ready for work. Because appellant did not have a car, his brother-in-law drove appellant to his sister Irene Hernandez's house so that she could drive him to the Brooks Club at Brooks Air Force Base, where appellant had worked for several years as a custodian. Appellant clocked in at 8:04 a.m. He also worked the following day, but skipped work on May 12th. After working a half-day on May 13th, appellant never returned to work again. Appellant moved out of his father's house on the day Wright's body was found and stayed with Irene for two weeks before moving back in with his father.

Soon after the murder, appellant called the manager of the Brooks Club, attempting to use the club bartender and a retired tech sergeant as alibis. Neither the bartender nor the sergeant testified at trial.

Two of appellant's former coworkers identified Wright as a woman that appellant had brought to the Brooks Club about six months before the murder.[9] Two other coworkers testified that when they heard news that Wright's body had been found they asked appellant if he had known her. Appellant confirmed that the deceased had been his next-door neighbor, but stated, "I don't know the bitch."[10] A couple of

appellant had visited his sister there several times.

**6.** In her statement that she gave to police shortly after the murder, Lowry indicated that she saw only two silhouettes in Wright's house. At trial, however, Lowry insisted that she told the police that she saw three people and that the information in the statement was incorrect.

**7.** There was much conflicting testimony at trial concerning appellant's hairstyle at the time of the offense. One witness said appellant had a shaved head and a "beaver tail," another said he had a "mohawk," and another said he had a clean cut hairstyle. Another witness explained that appellant changed his hairstyle frequently.

**8.** Terry Wright's Beretta did not have a hatchback.

**9.** This evidence was the basis for defense counsel's argument at closing that appellant and Wright had engaged in consensual sex on the night of the murder.

**10.** One of the coworkers testified that appellant had denied knowing the victim but had not used the word "bitch."

weeks later, appellant visited the club and another former coworker asked appellant where he had been lately. He replied jokingly that he had been a "fugitive on the run."

In March of 1995, Rebecca Alfaro and appellant moved out of appellant's father's house and into some apartments. When appellant was arrested shortly thereafter, Alfaro went to live with her mother. She boxed up appellant's personal things and took them with her. On October 16, 1995, she gave the boxes to his nephew, who gave them to appellant's sister, Irene. A few days before trial, investigators working for appellant's counsel requested clothes for appellant to wear during the trial. While looking through appellant's clothing, Irene found a pair of men's size 10 Fila athletic shoes. Like Rebecca Alfaro's Filas, these shoes are made of white leather with a red and blue Fila symbol on the side and tongue. The defense submitted these shoes into evidence at trial. Although the shoes submitted by the defense were similar in appearance to Alfaro's shoes, appellant's shoes were a different style (1–J17–0517) and had wholly dissimilar soles.[11]

■ This Court has the authority to review the factual sufficiency of a capital murder case. *See Jones v. State,* 944 S.W.2d 642, 647 (Tex.Crim.App.1996). Under the factual sufficiency review standard, we view all the evidence "without the prism of 'in the light most favorable to the prosecution'" and set aside the verdict only if it is "so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Clewis v. State,* 922 S.W.2d 126, 129 (Tex.Crim.App.1996). A clearly wrong and unjust verdict may occur in instances where the jury's finding is "manifestly unjust," "shocks the conscience," or "clearly demonstrates bias."

*Santellan v. State,* 939 S.W.2d 155, 164 (Tex.Crim.App.1997).

■ Appellant does not assert that the evidence is legally insufficient; therefore, we assume that the evidence is legally sufficient under the *Jackson v. Virginia* [12] test. Then, we consider *all* of the evidence in the record related to appellant's sufficiency challenge, comparing the evidence supporting with the evidence controverting the elemental fact in dispute. *See Santellan,* 939 S.W.2d at 164. Even if probative evidence supports the verdict, we may disagree with the jury's determination. But we must be "appropriately deferential" to the jury's findings and avoid substituting our judgment for that of the fact finder. *See id.*

Appellant asserts that no evidence puts him at either crime scene. He also contends that the DNA statistics and shoe prints merely demonstrate that appellant cannot be *excluded* as a suspect; they are not sufficiently reliable to establish his intention to kill the victim during an assault, a kidnapping, a burglary, and a robbery. Appellant denies that he was the source of the sperm found in the victim. Alternatively, appellant contends that, even if the sperm were his, the DNA evidence does not establish intent to kill because he and the victim "were known to have gone out on dates."

The evidence showed that appellant lived next door to the victim, was familiar with her unique house, and returned home from work around the same time she did on the night of the murder. Despite one in 19,900,000 odds, appellant's DNA profile matched the semen found in the victim. Contrary to appellant's argument, these impressive statistics support the jury's conclusion that appellant, as opposed to some unidentified "suspect" also sharing the same DNA profile, sexually assaulted, kidnapped, and killed Wright.[13]

---

11. Neither the State nor defense recalled Rebecca Alfaro to ask whether these shoes were the ones that she had purchased for appellant.

12. 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)

13. Testimony that appellant and Wright appeared together *once* at the Brooks Club six

We note that the perpetrator made a considerable effort to break into Wright's home and transport her several miles away before killing her and dumping her nude body. The perpetrator probably approached Wright's house on foot because she was abducted in her own car. Appellant lived next door to Wright and could have easily walked back to his house from the location where Wright's broken-down car was discovered (one to one-half miles away). The jury could have reasonably concluded that only a person living near Wright would take these particular steps to remove her from the neighborhood.

Further, the Fila shoe prints discovered at the victim's house and in the field connect appellant to both locations. The defense's submission of a similar pair of Fila shoes found in a box of appellant's things does not negate the State's evidence that Rebecca Alfaro had purchased shoes for appellant with soles identical to the prints. Alfaro testified that she did not pack up appellant's things until ten months after the murder and did not remember packing any of his shoes. The defense neglected to ask Alfaro whether the newly-discovered shoes were actually the ones that she had purchased for appellant. Moreover, the defense made no attempt to ask the Fila expert to identify the style and date appellant's proffered shoes were distributed or to comment on their soles.[14] Given the police's fruitless search for the shoes and appellant's multiple excuses for why the shoes were missing, the defense's eleventh-hour, serendipitous discovery of appellant's shoes could be seen to cast suspicion on their authenticity.

We are mindful that, in order to convict appellant, the jury must have discounted the testimony of defense witnesses who contradicted the State's physical evidence. Affording appropriate deference to the fact finder's credibility determinations, howev-er, we cannot say that the verdict is "manifestly unjust," "shocks the conscience," or "clearly demonstrates bias." *Santellan,* 939 S.W.2d at 165; *Clewis v. State,* 922 S.W.2d at 135. Because we do not find the verdict clearly "wrong and unjust," we reject appellant's factual sufficiency challenge and conclude the evidence is factually sufficient to support appellant's capital murder conviction. **Appellant's fourth point of error is overruled.**

### MOTIONS TO SUPPRESS

Appellant alleges in points of error one through three that the trial court erred in denying his motion to suppress the results of serology and DNA tests performed on a sample of blood taken from appellant pursuant to an arrest and search warrant. The State simultaneously executed an affidavit for an arrest warrant, alleging assault committed during a domestic disturbance unrelated to the instant offense, and an affidavit for a search warrant, alleging that blood, saliva, and hair samples taken from appellant would match samples taken from the scene of the instant offense and the murder victim. Appellant identifies nine factual assertions supporting the State's affidavits, which he alleges are false and made knowingly or with a reckless disregard for the truth. Appellant contends that if the nine challenged statements are excised from the affidavit then the remaining content is insufficient to establish probable cause, and the warrants and fruits of the search must be excluded pursuant to *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).

In *Franks,* the Supreme Court held that when at a suppression hearing,

> the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining con-

---

months before the murder would not convince a rational jury that they had a consensual sexual relationship, as appellant now suggests.

**14.** We do note, however, that the State also did not attempt to confirm whether these were the shoes that Rebecca Alfaro had purchased.

tent is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit. 438 U.S. at 156, 98 S.Ct. 2674. The Court made clear that this exclusionary rule does not extend to instances in which the police act "merely negligently" in collecting the facts alleged in the affidavit. *See id.* at 170, 98 S.Ct. 2674. Further, the affidavit must make a "truthful" showing of probable cause "in the sense that the information put forth is believed or appropriately accepted by the affiant as true." *Id.* at 165, 98 S.Ct. 2674. Here, the court conducted a pretrial suppression hearing at which both appellant and the State presented evidence. We recognized in *Janecka v. State,* 937 S.W.2d 456, 462 (Tex.Crim. App.1996), that "[a]s the sole fact-finder and judge of the witnesses' credibility and weight of the evidence, the trial court is owed great deference, and its ruling will be overruled only if outside the bounds of reasonable disagreement." Applying this standard, we find no basis to overrule the trial court's decision to deny appellant's motion to suppress.

### *Shoes*

■ Appellant's first two complaints derive from a contradiction between the search warrant affidavit and Officer Timothy Britt's testimony at the suppression hearing. Appellant's allegations are based upon the following portion of the search warrant:

Detective Michael McInnis, who was at the time of this incident assigned to the Homicide Unit of the San Antonio Police Department, interviewed [appellant]'s wife, a Rebecca [Alfaro]. Rebecca [Alfaro] was shown two photographs of a tennis shoe imprint. One shoe imprint was found outside the kitchen window where entry was made into the house and the other matching imprint was found near the complainants' nude body. The shoe imprint had a circle

with a cross through the middle of the circle located on the bottom of the sole of the shoe.

Immediately after being shown these similar pictures, Rebecca [Alfaro] told Detective McInnis that [appellant] had a pair of tennis shoes with the same design on the bottom. Rebecca [Alfaro] stated she knew this because she personally bought the tennis shoes for [appellant].

Detective McInnis was able to make telephone contact with [appellant] in which [appellant] told him that his father had thrown the tennis shoes in the trash. [Appellant] would not answer any further questions and instructed Detective McInnis to contact his lawyer, a Mr. Michael Callahan.

Appellant asserts that Officer Britt, who executed the affidavits for the arrest and search warrants, stated at the suppression hearing that he learned about appellant's discarded shoes through Detective McInnis' written report. Officer Britt acknowledged at the hearing, however, that McInnis's report, contrary to the search warrant affidavit, did not indicate that McInnis had spoken with appellant about the discarded tennis shoes. This inconsistency does not establish intentional perjury or reckless disregard for the truth.

Officer Britt testified that he may have learned about the discarded shoes from a conversation he had with Detective McInnis, as opposed to the report. Detective McInnis testified that he did not speak with appellant concerning the shoes and never told Officer Britt that he had. Detective McInnis explained, however, that he had spoken with one of appellant's sisters who informed him that her father would occasionally throw away dirty tennis shoes that appellant wore while mowing the grass. Thus, the only conflicting information contained in the affidavit is *who* told Detective McInnis that appellant's father could have thrown away the shoes. The underlying substantive information is

essentially consistent—"any misrepresentation was only with regard to *how* the information was gained." *See Janecka*, 937 S.W.2d at 465 (emphasis added) (finding that where "establishment of probable cause ... was substantially correct, there was no misrepresentation within the meaning of *Franks*"). That Officer Britt misunderstood or did not recall this detail at most establishes negligence—not that the State intentionally corrupted the affidavit with false information. *See id.*

■ Appellant also challenges the statement in the affidavit that Rebecca Alfaro was shown some photographs of shoe imprints. He points to the inconsistency between Officer Britt's testimony that Detective McInnis said that he had shown the photos to Rebecca and Rebecca's testimony that she did not recall *anyone* showing her photos of shoe prints. Detective McInnis explained at the hearing, however, that he had discussed the shoes with Rebecca, who informed him that she had bought identical tennis shoes for herself and appellant, and she showed McInnis her pair of shoes. The design on the bottom of Rebecca's shoes matched the prints discovered at both the victim's home and location where her body was found, and appellant does not contest that he was connected with shoes bearing the same pattern as the prints found at the crime scenes. Whether Rebecca was shown photographs of shoe prints is immaterial to establishing probable cause and, therefore, falls outside the scope of *Franks*. *See Franks*, 438 U.S. at 165, 98 S.Ct. 2674 (explaining that a "truthful" showing of probable cause does not mean "that every fact recited in the warrant affidavit is necessarily correct"); *Janecka*, 937 S.W.2d at 465.

*Prior Murder Conviction*

■ Appellant also challenges the statement in the arrest affidavit that, at the time appellant committed the assault, he

was serving parole on a prior murder conviction. In support of his allegation of perjury or reckless disregard, appellant points to Officer Britt's admission that the parole information contained in the affidavit was incorrect and to the testimony of Diana Seguin and Rebecca Alfaro, appellant's two former wives, that appellant was on parole for voluntary manslaughter—not murder. At the hearing, Officer Britt explained that he had checked appellant's State Identification Number ("SID") and learned that he had been charged with murder. The "SID" system, however, did not indicate whether the defendant had actually been convicted of a lesser offense. Officer Britt admitted that he made no effort to determine what offense appellant had been convicted of, but added that appellant's parole officer informed him that appellant was on parole for murder. Officer Britt's failure to confirm the murder charge, although negligent, does not equate to reckless disregard given his reasonable reliance on the parole officer's misinformation.[15] *See Franks*, 438 U.S. at 165, 98 S.Ct. 2674 (noting that probable cause may be founded upon hearsay). In any event, the fact remains that appellant was previously convicted for killing another person. Thus, the material difference between the murder and manslaughter conviction is not the type of false statement that triggers the Fourth Amendment concerns described in *Franks*.

*Diana Seguin*

■ Four of appellant's claims of deliberate falsehood are based on the contradictory testimony of Diana Seguin, appellant's former wife, whom Officer Britt identified as the informant referenced in the affidavit. The portions of the affidavit relevant to appellant's complaints are as follows:

Your Affiant has also interviewed an individual in regards to this case. The identity of this individual is known to your Affiant, but the seriousness of this

---

15. We note that since the time of appellant's conviction the offense of voluntary manslaughter has been subsumed into the murder statute. *See* TEX. PENAL CODE § 19.02(d).

particular violent crime coupled with a previous murder conviction of [appellant], places this individual in grave danger should the individual's identity be disclosed at this time.

\* \* \*

The said Informant states that at one time [appellant] was known to have held a firearm to the head of his six month old child threatening to kill the child and the child's mother. The Informant also has knowledge of an incident in which [appellant] attempted to push his wife and the child off a two story balcony and that [appellant] also threatened to "slice her up like a pig," referring to his wife. The Informant stated that the marriage in which [appellant] had been involved was "very hateful" and "full of violence."

\* \* \*

The Informant was shown a photograph of the location where the complainant's body was found. The said Informant was able to identify this location as being the exact same spot where [appellant] was known to frequent. The Informant states that [appellant] would frequent this exact same location with his ex-wife when they were experiencing marital problems.

In support of his allegation, appellant claims that Diana Seguin was not in grave danger and told no one that she was. Citing to a few pages of Seguin's testimony, he further avers that the assertions concerning the baby and the balcony are false, as well as the statement concerning the location of the victim's body.

At the hearing, Seguin did in fact deny telling Officer Britt that she was in grave danger, that appellant held a gun to her baby's head, and that he threatened to push her off the balcony. She stated that appellant used to take her to a place near

Loop 410 between Sulphur Springs Road and W.W. White Road, but denied that this location was anywhere near where the body was found.[16] She further insisted that someone had forged her signature on police photographs of the area. With respect to several of the State's questions, Seguin was contentious or non-responsive. At one point, the court instructed her to stop laughing, admonishing that the proceedings were a serious matter.

Deliberate falsehood or reckless disregard is not established simply because appellant's ex-wife denied making the statements in the affidavit. These allegations of false statements in the affidavit come down to a credibility determination between Officer Britt and Diana Seguin. "As the sole fact-finder and judge of the witnesses' credibility and weight of the evidence, the trial court is owed great deference, and its ruling will be overruled only if outside the bounds of reasonable disagreement." *Janecka,* 937 S.W.2d at 462. Therefore, we defer to the trial court's implicit rejection of Seguin's testimony. *See id.*

### Pre-text arrest

■ Appellant next complains about Officer Britt's failure to inform the magistrate that the arrest warrant for aggravated assault was only a pretext for the capital murder investigation. Appellant misapplies *Franks. Franks* refers to the Fourth Amendment's requirement that a warrant be supported by a "truthful" showing of probable cause. 438 U.S. at 165–65, 98 S.Ct. 2674. This allegation identifies no infirmity in either affidavit pertinent to whether probable cause exists to support the arrest and search warrants. *Cf. Whren v. United States,* 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) (holding that seizure of property from a vehicle detained on the pretext of a traffic violation is not unreasonable as

---

16. The body was found near the "spaghetti bowl"—a term describing the tangle of free-way at the 410 interchange.

long as police have probable cause to believe that a traffic violation occurred).

### Submission of samples for forensic testing

▮ Finally, appellant alleges that the following introductory portion of the affidavit is false:

> Physical evidence taken from the scene of the said offense, namely: sperm body fluids, seminal fluids, hair and pubic hair from the mattress of said complainant's residence, as well as a vaginal swab with sperm taken from the complainant, Terry Wright, has been submitted to the Bexar County Forensic Science Center, San Antonio, Bexar County, Texas, for analysis.

Appellant correctly points out that a records custodian from the Bexar County Medical Examiner's Office testified that as of December 15, 1994 (the date the affidavit was presented to the magistrate), they had received no samples taken from the crime scene. Whether samples had been collected from the crime scene, however, in no way connects appellant to the crime and thus has no bearing on the issue of probable cause. For this reason, it is likely that the statement concerning the collection of samples is not included in the probable cause portion of the affidavit. Furthermore, even if these statements were removed from the affidavit, the remaining portions of the affidavit would be sufficient to establish probable cause. *See Janecka*, 937 S.W.2d at 462. The purpose of the search warrant was to collect blood and hair samples from appellant to compare with the samples collected from the scene and the victim. Whether the samples had been or were yet to be submitted for forensic analysis at the time the affidavit

was presented to the magistrate is immaterial.[17]

Because the information supporting probable cause in the search and arrest warrant affidavits was substantially correct, we conclude that the State did not violate *Franks* and, thus, the trial court appropriately denied appellant's motion to suppress. *See Janecka*, 937 S.W.2d at 465. **Appellant's first three points of error are overruled.**

▮ Applicant asserts in his fifth point of error that the trial court erroneously overruled his motion to suppress statistical data interpreting the results of the DNA tests. Relying on *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), *Kelly v. State*, 824 S.W.2d 568 (Tex.Crim.App. 1992), and Texas Rules of Evidence 403 and 702, appellant argues that the DNA results were not relevant because the statistical evaluation was incomplete. He does not complain of any dereliction in the testing process or technique; instead, he faults the State for neglecting to compare the DNA of other potential suspects[18] with the sample taken from the victim. Without supporting authority, appellant avers that the DNA tests were incomplete without the suspects' genetic profiles because "the statistical evaluation must be related to the pool of available DNA."

▮ Under Texas Rule of Criminal Evidence 702, the trial court must determine whether proffered scientific expert testimony "is sufficiently reliable and relevant to help the jury in reaching accurate results." *Kelly v. State*, 824 S.W.2d at 572. To be considered reliable, evidence based on a scientific theory must satisfy three criteria: "(1) the underlying scienti-

---

**17.** Henry Holliday, the forensic serologist, testified that the DNA analyses on samples of the suspects and the victim commenced in January of 1995.

**18.** We presume that appellant is referring to the two men that Laura Lowry saw in Wright's bedroom on the night of the murder,

the two Hispanic males that Dwayne Cann saw working on the victim's car and that the taxi driver picked up, and a Hispanic male and African–American male that two people in Wright's neighborhood saw selling vacuum cleaner parts from an old pickup truck on the day before Wright was killed.

fic theory must be valid; (2) the technique applying the theory must be valid; and (3) the technique must have been properly applied on the occasion in question." *Id.* at 573. The *Kelly* standard is not limited to novel scientific evidence, but applies to all scientific evidence offered under Rule 702. *See Hartman v. State,* 946 S.W.2d 60, 63 (Tex.Crim.App.1997). We will not disturb the trial court's decision to admit scientific evidence absent an abuse of discretion. *See Griffith v. State,* 983 S.W.2d 282, 287 (Tex.Crim.App.1998).

Neither at trial nor now has appellant indicated how the failure to test other suspects rendered the DNA evidence produced at trial unreliable or irrelevant.[19] The State's DNA expert testified that PCR (polymerase chain reaction) analysis was conducted on the vaginal swab sample. The resulting DNA profile was then compared with DNA taken from appellant and another suspect, Brian Garcia. The probability that a randomly selected Southwestern Hispanic (appellant's genetic classification group) would match the genetic profile of the sample DNA was one in 19,900,000. Appellant's DNA matched the sample. Appellant fails to explain how conducting DNA profiles of other suspects could alter this conclusion. Thus, he presents nothing that abrogates the admissibility of the State's DNA evidence under *Kelly.* **Point of error five is overruled.**

### UNITED NATIONS CHARTER

■ In his sixth point of error, appellant alleges that his death sentence violates the United Nations Charter. Specifically, appellant relies upon the italicized portion of the Charter's preamble, which states:

We the peoples of the United Nations determined to save succeeding generations from the scourge of war, which twice in our lifetime has brought untold sorrow to mankind, and to *reaffirm faith in fundamental human rights, in the dignity and worth of the human person, in the equal rights of men and women* and of nations large and small, *and to establish conditions under which justice and respect for the obligations arising from treaties and other sources of international law can be maintained,* and to promote social progress and better standards of life in larger freedom, and for these ends to practice tolerance and live together in peace with one another as good neighbors, and to unite our strength to maintain international peace and security, and to ensure, by the acceptance of principles and the institution of methods, that armed force shall not be used, save in the common interest, and to employ international machinery for the promotion of the economic and social advancement of all peoples, have resolved to combine our efforts to accomplish these aims.

Accordingly, our respective Governments, through representatives assembled in the city of San Francisco, who have exhibited their full powers found to be in good and due form, have agreed to the present Charter of the United Nations and do hereby establish an international organization to be known as the United Nations.

U.N. CHARTER pmbl. Appellant argues that the death penalty denies him "the equal treatment which must be afforded all citizens" of the treaty nations. He further avers that the United States must abolish the death penalty "in order to insure that peace and security will prevail without provoking the use of armed forces by others for our own violation of the principles set out in the Charter." Appellant properly preserved this argument for appeal. We hold, however, that appellant does not have standing to raise such a claim before this Court.

---

19. We note that the trial court did not hold a hearing per *Kelly,* 824 S.W.2d at 573, to determine whether the State's proffered evidence was admissible; however, appellant did not request a hearing at trial, did not object to the court's failure to conduct a hearing, and does not argue now that he was entitled to a hearing.

■ Generally, individuals do not have standing to bring suit based on an international treaty when sovereign nations are not involved in the dispute. "Even where a treaty provides certain benefits for nationals of a particular state—such as fishing rights—it is traditionally held that 'any rights arising from such provisions are, under international law, those of states and ... individual rights are only derivative through the states.'" *Matta–Ballesteros v. Henman,* 896 F.2d 255, 259 (7th Cir.1990) (quoting Restatement 2d of the Foreign Relations Law of the United States § 115, comment (e) (1965)), *cert. denied,* 498 U.S. 878, 111 S.Ct. 209, 112 L.Ed.2d 169 (1990). For instance, in *United States v. Zabaneh,* 837 F.2d 1249, 1261 (5th Cir.1988), the Fifth Circuit held that the defendant did not have standing to rely on international extradition treaties as bases for challenging the court's jurisdiction. The court acknowledged that these treaties operate as contracts among nations. Therefore, it is the offended nation, not an individual, that must seek redress for a violation of sovereign interests. Likewise, appellant in the instant case may not rely on the United Nations Charter to seek reversal of his conviction.

To determine the Charter's meaning and purpose, we must first look to its terms. *See Air France v. Saks,* 470 U.S. 392, 397–399, 105 S.Ct. 1338, 84 L.Ed.2d 289 (1985) (construing Warsaw Convention by evaluating its plain language). The preamble, the portion of the Charter upon which appellant relies, does not establish individually enforceable rights. Instead, it announces the agreement of the 159 signatory countries to create a world organization committed to maintaining international peace. Appellant, as a United States citizen, lacks standing to appeal his sentence pursuant to the Charter. *See Dickens v. Lewis,* 750 F.2d 1251, 1254 (5th Cir.1984) (stating that "individual plaintiffs do not have standing to raise any claims under the United Nations Charter").

■ Moreover, the Charter's terms do not mandate abolition of the death penalty.[20] In fact, the Charter specifically prohibits the United Nations from interfering in a country's mechanism for enforcing laws or punishments. Chapter I, article 2, section 7 of the Charter states:

> Nothing contained in the present Charter shall authorize the United Nations to intervene in matters which are essentially within the domestic jurisdiction of any state or shall require the Members to submit such matters to settlement under the present Charter.

The United Nations Charter does not compel reversal of appellant's death sentence. **Therefore, we overrule appellant's sixth point of error.**

## ERRONEOUS ADMISSION OF EVIDENCE

■ In point of error seven, appellant contends that the trial court should have granted his motion for mistrial when the State introduced alleged victim-impact evidence at the guilt/innocence phase. He asserts that the error was prejudicial due to the minimal physical evidence linking appellant to the crime. The basis of appellant's complaint is the following colloquy between the State and Jeffrey Wright, the victim's brother, concerning his mother's reaction to news that her daughter was missing:

> Q: You mentioned that you had to leave the house. I think it was around

---

**20.** Chapter III of the Charter establishes six principal organs of the United Nations. One of those organs, the Economic and Social Council, created the position of Special Rapporteur whose duty is to report to the council concerning "extrajudicial, summary and arbitrary executions." Resolution 1982/35 of the Economic and Social Council. The council has renewed the mandate of the Special Rapporteur regularly since 1982. Thus, it appears that the United Nations Charter does not universally prohibit capital punishment; instead, it condemns executions conducted arbitrarily, summarily and without judicial oversight.

2:00 or 2:30, because your mother was upset; is that correct?

A: Yes, sir.

Q: Tell us a little bit about that.

A: She was very upset and crying. We just—we had tried—

At this point, defense counsel tendered an objection based on *Payne v. Tennessee,* 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), and stated that the witness's testimony was irrelevant, prejudicial victim-impact evidence. The trial court sustained appellant's objection and instructed the jury to disregard, but denied the subsequent motion for mistrial.

▆▆▆ Generally, a mistrial is only required when the improper evidence is "clearly calculated to inflame the minds of the jury and is of such a character as to suggest the impossibility of withdrawing the impression produced on the minds of the jury." *See Hernandez v. State,* 805 S.W.2d 409, 414 (Tex.Crim.App.1990) (quoting *Gonzales v. State,* 685 S.W.2d 47, 49 (Tex.Crim.App.1985). In all other situations, the jury is presumed to follow the trial court's motion to disregard improperly admitted evidence. *See Waldo v. State,* 746 S.W.2d 750, 754 (Tex.Crim.App.1988). Whether the erroneous admission of evidence requires a mistrial is determined by looking at the facts and circumstances of the case. *See Hernandez,* 805 S.W.2d at 414.

Under the circumstances of this case, we conclude that the court's instruction to disregard cured admission of the irrelevant evidence. The DNA evidence showed only 1 in 19,900,000 randomly selected people of appellant's racial classification group would match the DNA sample taken from the victim's body. Appellant owned Fila shoes with soles identical to prints found at both crime scenes. Appellant was also within close proximity of the crime scenes and had knowledge of the victim's house's layout. Finally, appellant acted suspiciously after the crime—skipping work and moving out of his father's house next door to the victim's house. Considering the previous facts, we conclude that admission of one sentence indicating the victim's mother was upset did not "inflame the minds of the jury" or influence the jury's verdict. **Hence, appellant's seventh point of error is overruled.**

▆▆▆ In his eighth point of error, appellant complains that the trial court erroneously admitted evidence concerning appellant's flight from police who were attempting to arrest him on an unrelated assault charge. Specifically, he refers to the State's questioning Detective Tim Britt:

Q. ... At any point in time did you become aware that the Defendant had fled the house?

A. Yes, I was.

Q. Did you, yourself, chase him down?

A. No, I did not.

Q. Did you observe him running away yourself?

A. No, I did not.

Appellant contends that the prosecutor failed to produce predicate facts to establish that the evidence of flight was related to the capital murder charge.

The testimony, however, was never presented to the jury. Instead, the court held a brief hearing outside the jury's presence to determine whether the State's proffered evidence of flight was admissible. At the conclusion of the hearing, the trial judge expressed his concern that the evidence of flight was unrelated to the capital murder charge, and the State consented not to present evidence of flight before the jury. Hence, appellant has not identified an evidentiary error. **Point of error eight is overruled.**

Finding no reversible error, we affirm the judgment of the trial court.