NUMBER 13-07-00489-CR



COURT OF APPEALS



THIRTEENTH DISTRICT OF TEXAS



CORPUS CHRISTI - EDINBURG 


 

 

KELLY O'BRIEN SIMPSON, Appellant,


v.



THE STATE OF TEXAS, Appellee.

 


On appeal from the 94th District Court


of Nueces County, Texas.


 


MEMORANDUM OPINION



Before Justices Rodriguez, Garza, and Vela


Memorandum Opinion by Justice Garza
 

 Appellant, Kelly O'Brien Simpson, was charged by indictment with solicitation of
capital murder. See Tex. Penal Code Ann. § 15.03(a), (d) (Vernon 2003), § 19.03(b)
(Vernon Supp. 2007). A jury found appellant guilty. The trial court sentenced appellant
to fifteen years' confinement in the Institutional Division of the Texas Department of
Criminal Justice ("ID-TDCJ"). By two issues, appellant contends that the trial court abused
its discretion in refusing to grant his motion for a mistrial, and he challenges the legal and
factual sufficiency of the evidence adduced at trial. We affirm.

I. Factual and Procedural Background


On March 8, 2007, a Nueces County grand jury charged appellant by indictment with
solicitation of capital murder. The indictment provided the following, in relevant part:

 KELLY SIMPSON, defendant,

 on or about AUGUST 23, 2006, in Nueces County, Texas, did then and there
with intent that Capital Murder, a Capital Felony, be committed, request,
command, or attempt to induce Angel Gomez to engage in specific conduct,
to wit: cause the death of Paul Dembowski for remuneration or the promise
of remuneration, that under the circumstances surrounding the conduct of
Angel Gomez, as the defendant believed them to be, would have constituted
Capital Murder . . . .


Trial began on June 25, 2007. At trial, the State called three witnesses--Sergeant
Laura Oelschlegel of the Nueces County Sheriff's Department, Angel Gomez, and
Detective Richard L. Garcia of the Corpus Christi Police Department--while appellant did
not call any.

a. Sergeant Oelschlegel's Testimony

Sergeant Oelschlegel has been employed as a detective with the Nueces County
Sheriff's Department for six years. She testified that appellant and a co-defendant in
another case, Dembowski, were incarcerated in the same jail in Nueces County. The
prosecutor informed her that Dembowski told his attorneys of appellant's plot to have him
killed. Another inmate, Gomez, confirmed the plot to Sergeant Oelschlegel after being
asked about it. In reviewing inmate records for the jail, Sergeant Oelschlegel determined
that Gomez and appellant were housed in the same unit at the time the events in question
transpired. When she spoke with Gomez, he revealed the plot without being solicited or
promised anything in return for his statement. She testified that inmates are usually
reluctant to talk to investigators about what transpires in the jail for fear of being regarded
as a snitch and that another officer searched appellant's jail cell and found no evidence in
furtherance of the alleged plot.

b. Gomez's Testimony


Gomez was an inmate in the Nueces County jail and had been in and out of jail
frequently because of several criminal convictions. Gomez was also a member of Raza
Unida, a prison gang. When shown a picture of Dembowski, Gomez identified him and
stated that he had met appellant and Dembowski while in the Nueces County jail. 

Gomez testified that he did not volunteer or seek out law enforcement officials to tell
them about the alleged plot to kill Dembowski. Gang intelligence officers pulled him out
of his cell, asked him what he was going to do, and informed him that they could "get" him
for conspiracy. Gomez was not promised anything by law enforcement officials for making
his statement or for testifying. 

Gomez first met appellant in August 2006, while both were housed in unit 6-P in the
Nueces County jail. Gomez and appellant spoke behind closed doors. Gomez's
conversations with appellant eventually escalated to a point where appellant asked for
Gomez's help in taking care of somebody. Gomez, thinking that appellant was simply
asking him to beat someone up, responded by stating that "it all depends" and that he was
"not alone in this." Appellant responded that he would get back to him.

After both appellant and Gomez went to court together on unrelated charges,
appellant approached him once again. Gomez testified as follows with respect to the
second encounter with appellant:

 A [Gomez]: He had asked me--he found out--he says, 'I noticed that--' 

 he--he was impressed how I approached the bench with the
Judge concerning my affiliation, and that's when he
approached me the second time, and told me, he asked me,
"[w]hat would you charge?" I said, "[c]harge for what?" I
said--he said, "I want you to take care of my co--my partner." 
I said, "[y]our partner?" I said--at first, I didn't know who it was
[be]cause I had only been there on one side.

 

 . . . .

 

 A [Gomez]: Like I said, at first, beat him up, touch him up just little bit, and 

 then he turned around and asked me, "[h]ow much do you
charge?" I said, "[w]ell, like I said, it all depends." He says
[sic], "[w]ell, I want him erased." I said, "[e]rased. What do you
mean?" He said, "I want him dropped." In other words, he
wanted him dead.


 In response to appellant's request, Gomez again told him that he was not alone, his
involvement would implicate "his people," and if he was caught, it would be considered
organized crime. Gomez did not quote appellant a price at first, but later, he told appellant
that he wanted a large sum of money and "two keys." (1) Gomez knew that appellant did not
have any money because he did not make many purchases at the commissary and he had
a court-appointed attorney. Appellant then made a counter-offer, offering one of the
Porsches that he had with an open title. When appellant made his counter-offer, Gomez
believed that he was serious.

 Gomez was later released from jail, but shortly thereafter, he was arrested on
another charge. Gomez was again housed in the same unit as appellant. Later, Gomez
was transferred to unit 4-P in the Nueces County jail. At this time, he met Dembowski. 
Gomez subsequently told Dembowski everything about the alleged plot because he did not
want to get wrapped up in such a high-profile case. Gomez then informed appellant that
he was not going to get involved. Gomez testified that appellant was disappointed.

 On cross-examination, Gomez explained that he and appellant communicated with
each other through the crack of the jail cell doors, that he was proficient in identifying
voices, and that he recognized appellant's voice. Gomez also testified that Dembowski
had an established relationship with Gomez's "home boys." In fact, Dembowski
occasionally bought Gomez's fellow gang members food and chips at the commissary. 
Appellant's trial counsel then questioned Gomez about a statement he made regarding
appellant's purchases from the commissary and the following exchange ensued:

 Q [Appellant's trial counsel]: Okay. And if--if in your statement you
indicated that Kelly didn't make any
purchase [sic] from [the] jail commissary,
would that sound familiar to you?


 A [Gomez]: Ever [sic] so often, not as a--not as much
as like he intended to have. I mean, if he
was willing to--if he was really serious
about--like I say, if he was really serious,
why would he approach me and ask me
to take care of his partner? If he--he
had--in the first case, which was the
murder, which it was, he didn't--he
wasn't going to commissary, okay?

 

 Q: Judge, I'm going to object to
nonresponsive, and I'm also going to ask
for an instruction to the jury to disregard
his statement.

 

 THE COURT: That's sustained. The jury will not--

 

 [Appellant's trial counsel]: And we time [sic] move for--I'm sorry,
Your Honor.

 

 THE COURT: The jury will not consider any of his
statements as being somewhat
nonresponsive. Why didn't [sic] you
reask the question.

 

 [Appellant's trial counsel]: Okay. I would also move for a mistrial at
this point.

 

 THE COURT: It's denied.


c. Detective Garcia's Testimony


Detective Garcia has been employed in the Criminal Investigations Division of the
Corpus Christi Police Department for twenty-one years. In April and May 2006, he
investigated a separate case involving both appellant and Dembowski. Detective Garcia
identified State's exhibit number 5 as a Texas Certificate of Title for a 1985 Porsche
automobile. This certificate of title listed appellant as the purchaser of the Porsche. Both
appellant and Dembowski had signed the title documents for the Porsche. Detective
Garcia testified that this Porsche was black and was purchased by appellant in Corpus
Christi with cash money. He further testified that appellant purchased a second Porsche
that was "silver or gold-colored" in San Antonio.

Detective Garcia spoke to Susan Simpson, appellant's mother, on several
occasions. After speaking with him, Susan provided Detective Garcia with several letters
that appellant had hand-written to her while in jail. The letters were accompanied by the
envelopes that appellant had addressed from the Nueces County Jail. At the urging of the
State, Detective Garcia then read excerpts from the letters. (2) Detective Garcia recited the
following from State's exhibit number 10: "'This may cheer you up. I know it helps me. 
He [Dembowski] is afraid to come out of his cell in 4-P. He rarely even goes out to shower
for some reason. Certain gang members keep fucking with him. I can't imagine how that
happened.' And it's got a smiley face on the letter." Detective Garcia then recited the
following from State's exhibit number 11, a second letter written by appellant:

 "I [appellant] can do nothing about it. He [Dembowski] won't make it out of
the courtroom."

 

 . . . .

 Second it says, "I promise you . . . he will not make it long in prison. 
I have made many friends in here. . . . I have a high-ranking member of the
Mexican Mafia who is a friend, and he is also part of the reason Paul will not
leave his cell."

 

 . . . .

 

 Next one, "The ones in here for the worst things are some of the
coolest ones. The older higher-ups"--can't make that one--"members all
told if I--there I will be fine. Imagine me hanging out with the Mexican Mafia
under protection, the opposite of what he will have. I love you, Mom. Kelly."


Detective Garcia stated that he had read all of the contents of the letters and that the "he"
that appellant repeatedly referenced in the letters was indeed Dembowski. He further
stated that the Mexican Mafia and Raza Unida are rival prison gangs and that their
members "are generally capable of carrying out violent crimes."

 On cross-examination, Detective Garcia testified that when he arrested appellant
in May 2006, the automobiles owned by appellant were impounded but were eventually
turned over to Susan. She subsequently sold the two Porsches. However, at the time of
his arrest, the title of one of the Porsches was still in appellant's name. 

After Detective Garcia was excused, appellant's trial counsel then repeated his
request for a mistrial. The following exchange occurred:

 [Appellant's Trial Counsel]: Judge, at this time, for purposes of the
record, I would like to reurge [sic] our
request for a mistrial, based on the
statement Mr. Gomez made on the stand. 
He indicated that there was a murder
case related to Mr. Simpson. And I
believe, based on that, the jury will be
tainted to the fact that my client will be
unfairly prejudiced.


 THE COURT: Well, I will note that it was upon
questioning by Defense Counsel when
that occurred, but that's denied.


 The jury subsequently found appellant guilty of solicitation of capital murder. See
id. § 15.03(a). On June 25, 2007, the trial court certified appellant's right to appeal. On
July 16, 2007, the trial court sentenced appellant to fifteen years' confinement in the ID-TDCJ and ordered that this sentence run concurrently with appellant's convictions in
Nueces County trial court cause numbers 06-CR-1684-C and 06-CR-1651-C. (3)
 Appellant
timely filed his notice of appeal on July 17, 2007. 

II. Analysis


a. Appellant's Motion for Mistrial

In his first issue, appellant argues that the trial court abused its discretion in refusing
to grant his motion for mistrial following Gomez's reference to an extraneous murder
charge. In particular, appellant contends that Gomez's reference to the extraneous murder
charge was inadmissible and highly prejudicial pursuant to rules 403 and 404(b) of the
Texas Rules of Evidence. See Tex. R. Evid. 403, 404(b). The State asserts that appellant
failed to preserve this issue for appellate review. The State further argues that even if
appellant had preserved this issue, the trial court's instruction to disregard cured any
prejudice caused by Gomez's reference to the extraneous murder charge.

1. Standard of Review

 An appellate court reviews a trial court's ruling on a motion for mistrial using an
abuse of discretion standard of review. Webb v. State, 232 S.W.3d 109, 112 (Tex. Crim.
App. 2007) (citing Wead v. State, 129 S.W.3d 126, 129 (Tex. Crim. App. 2004)). We view
the evidence in the light most favorable to the trial court's ruling and uphold the trial court's
ruling if it was within the zone of reasonable disagreement. Id.; see Archie v. State, 221
S.W.3d 695, 699 (Tex. Crim. App. 2007). 

"Only in extreme circumstances, where the prejudice is incurable, will a mistrial be
required." Hawkins v. State, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004); see Simpson v.
State, 119 S.W.3d 262, 272 (Tex. Crim. App. 2003). Generally, a prompt instruction to the
jury to disregard the objectionable testimony will cure error, including references to
extraneous offenses. Ovalle v. State, 13 S.W.3d 774, 783 (Tex. Crim. App. 2000). The
determination of whether an error justifies a mistrial is made by examining the particular
facts of the case. See id.; see also Reynolds v. State, No. 13-05-00643-CR, 2007 Tex.
App. LEXIS 6139, at *14 (Tex. App.-Corpus Christi Aug. 2, 2007, no pet.) (mem. op., not
designated for publication). A mistrial is required only when the testimony is "clearly
calculated to inflame the minds of the jury and is of such a character as to suggest the
impossibility of withdrawing the impression produced on the minds of the jury." 
Westmoreland v. State, 174 S.W.3d 282, 290 (Tex. App.-Tyler 2005, pet. ref'd) (quoting
Hinojosa v. State, 4 S.W.3d 240, 253 (Tex. Crim. App. 1999)). A reviewing court will
presume the jury will follow the trial court's instructions to disregard improper testimony. 
Id. (citing Colburn v. State, 966 S.W.2d 511, 520 (Tex. Crim. App. 1998)).


2. Discussion

The original objection made by appellant's trial counsel was that Gomez was
nonresponsive. The trial court sustained the objection and instructed the jury to disregard
Gomez's response as nonresponsive. Appellant's trial counsel did not argue that Gomez's
statement prejudiced appellant and that the information provided was inadmissible until
closing argument. Because appellant's trial counsel originally objected to the
responsiveness of Gomez's answer and failed to make his 403 and 404(b) objections until
closing argument, we conclude that appellant has not preserved this issue for appeal. See
Tex. R. App. P. 33.1 (providing that "[a]s a prerequisite to presenting a complaint for
appellate review, the record must show that . . . the complaint was made to the trial court
by a timely request, objection, or motion" stating the specific grounds for the desired ruling
if the specific grounds are not apparent from the context) (emphasis added); see also
Montgomery v. State, 810 S.W.2d 372, 388 (Tex. Crim. App. 1991) (op. on reh'g) (holding
that an objection under both rules 403 and 404(b) is required to preserve error regarding
the admission of evidence of an extraneous offense); Zayas v. State, No. 13-04-532-CR,
2005 Tex. App. LEXIS 9693, at **5-6 (Tex. App.-Corpus Christi Nov. 17, 2005, no pet.)
(mem. op., not designated for publication) (concluding that the failure to specifically make
a rule 403 or rule 404(b) objection to the trial court in a timely manner does not preserve
error). 

Moreover, even if the issue had been preserved, the trial court's instruction to the
jury to disregard Gomez's statement was sufficient to cure any error that may have arisen
from the statement. Detective Garcia testified that appellant and Dembowski had been
investigated in another case in April or May of 2006. (4)
 Furthermore, Gomez testified,
without objection, that appellant and Dembowski were involved in another "high-profile
case," in explaining why his "people" would not carry out the alleged plot to kill Dembowski. 
It is also noteworthy that the complained of testimony was elicited by appellant's trial
counsel, thus supporting a finding that the testimony was given inadvertently. A mistrial
is required only when the testimony is clearly calculated to inflame the jury and that
curative instructions are unlikely to prevent prejudice to appellant. See Westmoreland, 174
S.W.3d at 290; see also Hawkins, 135 S.W.3d at 77 (holding that a mistrial is warranted
when the improper conduct is so prejudicial as to render the continuation of the trial
wasteful and futile and that only in extreme circumstances, when the prejudice is incurable,
will a mistrial be required); McKay v. State, 707 S.W.2d 23, 36 (Tex. Crim. App. 1985)
(holding that in order for an improper argument to rise to a level mandating reversal, the
argument must be "extreme or manifestly improper, or inject new and harmful facts into
evidence"). Furthermore, we must presume that the jury followed the trial court's
instructions to disregard Gomez's statement. See Ladd v. State, 3 S.W.3d 547, 567 (Tex.
Crim. App. 1999); Gardner v. State, 730 S.W.2d 675, 696 (Tex. Crim. App. 1987); Allen
v. State, 202 S.W.3d 364, 370 (Tex. App.-Fort Worth 2006, pet. ref'd). (5) Because the
record contains testimony regarding another "high-profile" investigation involving appellant
and Dembowski that was not objected to, and because a prompt instruction to the jury to
disregard the objectionable testimony usually will cure error involving references to
extraneous offenses, the trial court did not abuse its discretion in refusing to grant
appellant's motion for mistrial. Accordingly, appellant's first issue is overruled.

b. Legal and Factual Sufficiency of the Evidence

 In his second issue, appellant argues that the evidence supporting his conviction is
legally and factually insufficient. We disagree.

 1. Standard of Review 

In a legal sufficiency review, we view the evidence in the light most favorable to the
prosecution to determine whether any rational trier of fact could have found the essential
elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307,
318-19 (1979); Watson v. State, 204 S.W.3d 404, 414-17 (Tex. Crim. App. 2006). The trier
of fact is the sole judge of the facts, the credibility of the witnesses, and the weight given
to testimony. See Tex. Code Crim. Proc. Ann. art. 38.04 (Vernon 1979); Jackson, 443
U.S. at 318-39; Beckham v. State, 29 S.W.3d 148, 151 (Tex. App.-Houston [14th Dist.]
2000, pet. ref'd). We do not reevaluate the weight and credibility of the evidence, whether
circumstantial or direct, nor do we substitute our own judgment for that of the trier of fact. 
Mosley v. State, 141 S.W.3d 816, 821 (Tex. App.-Texarkana 2004, pet. ref'd); Beckham,
29 S.W.3d at 151. Instead, we consider whether the jury reached a rational decision. 
Beckham, 29 S.W.3d at 151.

 Each fact need not point directly and independently to the guilt of the appellant, as
long as the cumulative force of all the incriminating circumstances is sufficient to support
the conviction. Hooper v. State, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing Johnson
v. State, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993); Barnes v. State, 876 S.W.2d 316,
321 (Tex. Crim. App. 1994); Alexander v. State, 740 S.W.2d 749, 758 (Tex. Crim. App.
1987)). Circumstantial evidence is as probative as direct evidence in establishing the guilt
of an actor; circumstantial evidence alone can be sufficient to establish guilt. Guevara v.
State, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004). On appeal, both circumstantial and
direct evidence cases are examined using the same standard of review. Id.

 We measure the sufficiency of the evidence by the elements of the offense as
defined by the hypothetically correct jury charge. Malik v. State, 953 S.W.2d 234, 240
(Tex. Crim. App. 1997); Adi v. State, 94 S.W.3d 124, 131 (Tex. App.-Corpus Christi 2002,
pet. ref'd). "Such a charge would accurately set out the law, would be authorized by the
indictment, and would not unnecessarily increase the State's burden of proof." Malik, 953
S.W.2d at 240. A person commits the offense of solicitation if, "with intent that a capital
felony or felony of the first degree be committed, he requests, commands, or attempts to
induce another to engage in specific conduct that, under the circumstances surrounding
his conduct as the actor believes them to be, would constitute the felony or make the other
a party to its commission." Tex. Penal Code Ann. § 15.03(a).

 In a factual sufficiency review, we review the evidence in a neutral light to determine
whether the evidence is so weak that the jury's verdict seems clearly wrong and manifestly
unjust. Watson, 204 S.W.3d at 414-15. After considering all of the evidence in the record
related to appellant's sufficiency challenge, we compare the evidence weighed by the jury
that tends to prove the elemental fact in dispute with the evidence that tends to disprove
it. Santellan v. State, 939 S.W.2d 155, 164 (Tex. Crim. App. 1997) (en banc). This Court
will not reverse the jury's verdict unless we can say with some objective basis in the record
that the great weight and preponderance of the evidence contradicts the verdict. Watson,
204 S.W.3d at 415.

 2. Discussion

 In arguing that the evidence supporting his conviction is legally and factually
insufficient, appellant states that: no corroborating evidence of the alleged plot was found
in appellant's jail cell; no other inmates testified regarding the conversations between
Gomez and appellant; appellant could not have provided the Porsche because it was in
police custody since his arrest; appellant's criminal history was non-violent so he was
unlikely to have committed this offense; Gomez was a Raza Unida member, not a Mexican
Mafia member, as mentioned in appellant's letters to his mother; and Gomez's testimony
was not credible because law enforcement allegedly threatened to charge him with
conspiracy to commit capital murder.

 Despite appellant's arguments, we find that the jury was rationally justified in finding
that the State proved the essential elements of solicitation of capital murder beyond a
reasonable doubt. See Tex. Penal Code Ann. § 15.03(a). Appellant sought out Gomez
to see if he or "his people" would kill Dembowski. In exchange for doing this, appellant
offered the Porsche to which he had open title. See id. § 19.03(a)(3) (providing that a
person commits the offense of capital murder if the person receives remuneration or is
promised remuneration in exchange for killing another). Though the timing is not clear
from the record, the Porsche was turned over, at some point, to Susan while appellant was
still in jail. Therefore, it was possible that appellant was capable of directing Susan to
provide the Porsche to Gomez as payment. In any event, it was within the province of the
jury to make a reasonable inference that appellant believed that he was capable of
providing the Porsche as payment to Gomez for the killing of Dembowski at the time he
made his counter-offer. See Hooper, 214 S.W.3d at 13, 15-16 (holding that the jury, as
the trier of fact, may draw reasonable inferences from the facts and that the reviewing court
must give deference to such inferences). 

 Section 15.03(b) provides that a person may not be convicted of criminal solicitation
based solely on the "uncorroborated testimony of the person allegedly solicited unless the
solicitation is made under circumstances strongly corroborative of both the solicitation itself
and the actor's intent that the other person act on the solicitation." Tex. Penal Code Ann. 
§ 15.03(b). However, it appears that the jury did not rely solely on Gomez's testimony in
establishing appellant's intent to have Dembowski killed. As previously mentioned,
appellant wrote letters to Susan indicating that Dembowski would not make it out of the
courtroom, that Dembowski will not make it long in prison, and that Dembowski will not
leave his cell because of appellant's relationship with prison gang members. Appellant's
letters to Susan corroborate Gomez's testimony and provide the jury with sufficient
evidence to make a reasonable inference that appellant intended to have Dembowski
killed. See Hooper, 214 S.W.3d at 13, 15-16. Therefore, it was not necessary for the
State to present testimony of other inmates to corroborate Gomez's testimony regarding
his conversations with appellant. See id. at 13; Guevara, 152 S.W.3d at 49. 

 In addition, the fact that no evidence of the alleged plot was found in appellant's jail
cell is not dispositive because appellant's letters and Gomez's corroborated testimony
establish that appellant intended to have Dembowski killed. It was not incumbent upon the
State to provide tangible, direct evidence, as appellant seems to suggest, to establish the
essential elements for the offense given that circumstantial evidence alone may support
a conviction and it is the cumulative force of the evidence that guides our review. See
Hooper, 214 S.W.3d at 13; Guevara, 152 S.W.3d at 49. Appellant's remaining contentions
were within the province of the jury to decide and we are prohibited from re-weighing the
evidence and substituting our judgment for that of the jury. See Mosley, 141 S.W.3d at
821; Beckham, 29 S.W.3d at 151. 

 Based on the foregoing, we conclude that the jury was rationally justified in finding
guilt beyond a reasonable doubt and that the jury's verdict is not against the great weight
and preponderance of the evidence. Therefore, the evidence adduced at trial is legally and
factually sufficient to support appellant's convictions. Accordingly, we overrule appellant's
second issue. 

III. Conclusion


 Having overruled both of appellant's issues on appeal, we affirm the judgment of the
trial court. 


 

 DORI CONTRERAS GARZA,

 Justice


Do not publish. 

Tex. R. App. P. 47.2(b).

Memorandum Opinion delivered and 

filed this the 21st day of August, 2008. 


 
1. 
[1] Gomez testified that "two keys" meant drugs.
2. 
[2] The first letter, State's exhibit number 10, was dated August 30, 2006, while the second letter, State's
exhibit number 11, was mailed on September 5, 2006.
3. 
3 Though not evident from the record, appellant admits in his brief that both he and Dembowski were
indicted for the murder of appellant's father in Nueces County trial court cause number 06-CR-1684-C; he
pleaded guilty to the indictment and was sentenced to life in prison on November 13, 2006. The record does
not address Nueces County trial court cause number 06-CR-1651-C.

4. In fact, appellant concedes this fact in his brief when he states that "[t]he murder-for-hire jury was 

aware from the testimony of both Sgt. Oelschlegel and Sgt. Garcia that [a]ppellant and Dembowski had been
investigated in another case."

5. In Gardner, the Texas Court of Criminal Appeals noted that:


 In the vast majority of cases in which argument is made or testimony comes in, deliberately
or inadvertently, which has no relevance to any material issue in the case and carries with
it some definite potential for prejudice to the accused, this Court has relied upon what
amounts to an appellate presumption that an instruction to disregard the evidence will be
obeyed by the jury. In essence, this Court puts its faith in the jury's ability, upon instruction,
consciously to recognize the potential for prejudice, and then consciously to discount the
prejudice, if any, in its deliberations. Thus we say the harm deriving from the unresponsive
answer has been "cured."


730 S.W.2d 675, 696 (Tex. Crim. App. 1987) (internal citations omitted).