Opinion issued May 1, 2003







 
 




 



In The
Court of Appeals
For The
First District of Texas




NO. 01-01-00950-CR




RANDY EDWARD GOODRUM, Appellant

V.

THE STATE OF TEXAS, Appellee




On Appeal from the 23rd District Court
Brazoria County, Texas
Trial Court Cause No. 39307 




MEMORANDUM OPINION

          Appellant, Randy Edward Goodrum, was charged by indictment with two
counts of aggravated sexual assault. A jury found appellant guilty, found five
enhancement paragraphs to be true, and assessed punishment at life imprisonment on
each count.
          In addressing appellant’s nine points of error, we examine whether (1) the trial
court erred in denying appellant’s motions to suppress, (2) the trial court erred in
denying appellant’s motion for discovery of the State’s DNA experts’ records, (3) the
evidence was factually sufficient to support the verdict, (4) the trial court erred in
admitting the photo lineup into evidence, (5) testimony about the blood sample used
in DNA analysis and re-labeled “Exhibit 58” should have been excluded from
evidence due to the failure to admit Exhibit 58 into evidence, (6) the blood sample
should have been excluded from evidence due to a break in the chain of custody, (7)
appellant was denied effective assistance of counsel, (8) judicial misconduct
occurred, and (9) evidence of enhancements should have been excluded.
          We affirm. Background
          On June 14, 1997, the complainant and her daughter were alone in their home,
asleep in the same bed. The complainant woke at about 5:00 a.m. to find a man
standing over her wearing a ski mask. The complainant let out a scream, but did not
wake her child. The man held up a knife and said “Sh-h-h-h-h, I’ll hurt that baby; you
know I will.” The man asked for her purse and the complainant took him in the living
room to get it. After lying on the floor as instructed, the man taped the complainant’s
hands behind her back with duct tape and put tape over her eyes and mouth. The man
then sexually assaulted the complainant as she lay on the living room floor, ejaculated
on her stomach, and explained that his reason for doing so was so that there would
be no evidence. He then wiped the complainant off with a towel and took the towel
with him when he left.
          The complainant managed to rub the duct tape off of her eyes and mouth, get
a knife from the kitchen, and cut the tape off of her hands. After discovering that her
telephone was dead and hearing a vehicle start up, she ran to the neighbors’ house
and told them that she had been raped. She then ran back to her house, got her
daughter, and they both went to the neighbors’ house. The neighbors called the
police. 
          The complainant observed the attacker before he covered her eyes with duct
tape and was also able to see a little bit by looking under the duct tape once it was
placed over her eyes. The complainant described the attacker as approximately her
height of 5'6", slender build, with brown hair and brown eyes. The complainant
estimated that the attacker was in his twenties, was clean-shaven and had no hair on
his chest. He spoke with a real country drawl, had a foul odor, and wore a plaid
flannel shirt and jeans. 
          After the police arrived, Detective Carol Atkins of the Alvin Police Department
took the complainant to the hospital for a sexual assault examination. The hospital
performed a rape kit examination, and the night shirt that the complainant was
wearing when she was sexually assaulted was kept as evidence. After leaving the
hospital, Atkins took the complainant to the police station to make a formal statement. 
          On July 8, 1997, two analysts from the Texas Department of Public Safety
(DPS) crime laboratory, searched the complainant’s residence for evidence of a
sexual assault. Using a luma light, the analysts located the presence of semen on the
living room carpet. The analysts collected a sample of the carpet fibers and took them
back to the laboratory for testing. Spermatozoa were detected in the carpet fibers as
a result of the testing. The evidence was sealed, assigned a lab number, and placed
into a freezer vault to save for further analysis if ever required. 
          Subsequently, the complainant associated the attacker with one of the men who
had delivered a refrigerator to her home a few months prior to the sexual assault. The
complainant described the attacker as having a similar country drawl that she
remembered the delivery man having, as well as similar in height, hair color and eye
color. After investigating, Atkins determined that the appellant matched the physical
description of the attacker and that he had worked as a delivery helper for the driver
that delivered the complainant’s refrigerator. However, Atkins was unable to locate
the appellant for some time. 
          In June of 2000, the complainant picked appellant out of a photo lineup as the
person who had delivered her refrigerator and whom she had associated with the
attacker. Atkins obtained and executed a search warrant for a sample of appellant’s
blood for DNA testing. Atkins observed while a sample of appellant’s blood was
taken at Northeast Medical Center. Atkins initially took the blood sample to the
Alvin Police Department, refrigerating it until she delivered it to the Texas DPS
Crime Lab in Houston the next day. DNA testing was performed on appellant’s
blood and Atkins was notified of the results in July of 2000. Based on the results of
the DNA testing, Atkins prepared a probable cause affidavit and obtained an arrest
warrant for appellant. Appellant was arrested on July 24, 2000.
Motions to Suppress
          In his first point of error, appellant asserts the trial court erred in denying his
motions to suppress evidence of his blood and hair samples, and all evidence
following that, which was seized under the search warrant. Appellant argues that the
information in the affidavit underlying the search warrant was insufficient to establish
probable cause. Additionally, appellant asserts that the information set forth in the
affidavit was too stale to form the basis of a search warrant.
Probable Cause
          The court conducted a pretrial suppression hearing at which the appellant
presented evidence and both the appellant and the State offered closing arguments. 
As the sole fact-finder and judge of the witnesses’ credibility and weight of the
evidence, the trial court is owed great deference, and its ruling will be overruled only
if outside the bounds of reasonable disagreement. Hinojosa v. State, 4 S.W.3d 240,
247 (Tex. Crim. App. 1999). 
          No search warrant shall issue unless sufficient facts are first presented to satisfy
the issuing magistrate that there is probable cause for its issuance. Tex. Code Crim.
Proc. Ann. art. 18.01(b) (Vernon 2003). A sworn affidavit setting forth substantial
facts establishing probable cause shall be filed in every instance in which a search
warrant is requested. Id. The sworn affidavit must set forth sufficient facts to
establish probable cause: (1) that a specific offense has been committed, (2) that the
specifically described property or items that are to be searched for or seized constitute
evidence of that offense or evidence that a particular person committed that offense,
and (3) that the property or items constituting evidence to be searched for or seized
are located at or on the particular person, place, or thing to be searched. Id. art.
18.01(c). The validity of the search warrant is examined under a “totality of the
circumstances” analysis. Hennessy v. State, 660 S.W.2d 87, 90 (Tex. Crim. App.
1983). In determining whether probable cause exists to issue a warrant, a magistrate
may draw reasonable inferences from the affidavit and must interpret the affidavit in
a common sense and realistic manner. Ramos v. State, 934 S.W.2d 358, 362-63 (Tex.
Crim. App. 1996).
          Here, the affidavit in support of the search warrant contains the following
pertinent statements offered by Detective Atkins to show probable cause:
The victim, [the complainant] identified the assailant as thin, small
muscled man with no hair on his chest, 5'09", 150-155 pounds, brown
hair, brown eyes with an age range of mid 20's, with a country drawl in
need of a bath. The assailant was wearing a black ski mask, black knit
gloves, dark colored tee shirt, plaid shirt and long pants. At the time of
the incident, [the complainant] was unable to identify any suspects, but
was focused on the subject’s voice.
 
. . . .
 
Your Affiant is in possession of statements from two (2) area residents
that stated that a dark blue 1992-1994 Chevrolet truck was observed on
the wrong side of the roadway near mailboxes on Mockingbird, in the
area of [the complainant’s] residence at approximately 4:00 a.m.,
Saturday, June 14, 1997.
 
[The complainant] moved into her residence in April, 1997, just two
months before the incident. Prior to [the complainant] moving into her
residence, she had contact with several repairmen. [The complainant]
associated a man who delivered a new refrigerator she purchased from
Montgomery Wards with a voice similar to the subject who assaulted
her.
 
. . . .
 
Your Affiant is in possession of a laboratory analysis report issued by
Texas Department of Public Safety Crime Laboratory in Houston, Texas
wherein carpet fiber evidence submitted indicates the presence of semen. 
To identify the suspect by D.N.A. analysis, 25-30 pulled head and pubic
hairs, and a known blood sample in a purple top is needed.
 
In December, 1997, [the complainant] turned over the delivery receipt
of refrigerator wherein the subject was eventually identified only as
RANDY GOODRUM who had worked for a contract truck. 
 
. . . .
 
GOODRUM’S description fit the subject described by [the
complainant]. GOODRUM’S driver’s license listed an address of 5414
Live Oaks in Spring, Texas. In addition, GOODRUM’s driving record
puts him in the Houston and surrounding area. GOODRUM has several
entries on his criminal history record consisting of Burglaries, Assault,
Forgery, Fraud, Dangerous Drugs, Sex Offense, and Public Order
Crimes.
 
On August 7, 1998, your Affiant received San Antonio Police
Department Arrest Report . . . wherein RANDY EDWARD GOODRUM
was arrested for Burglary of a Building. The report contained
information that GOODRUM was dirty and ragged, in possession of a
1992 green Chevrolet truck wherein contents included brown knit
gloves, a green ski mask, a roll of grey duct tape, and various tools. In
addition, the report reflected that GOODRUM had gained entry into the
building by prying the door.
 
. . . .
 
 On June 16, 2000, three (3) years after the sexual assault, your Affiant
met with [the complainant]. [The complainant] was shown a folder
containing six (6) photos wherein [the complainant] immediately
identified RANDY EDWARD GOODRUM . . . as the person who
delivered the refrigerator, and the person’s voice who is similar to the
person who sexually assaulted her. During the interview with [the
complainant], she stated that she remembers his eyes and feels sure that
the person she identified in the photo lineup is the person who sexually
assaulted her on June 14, 1997 in her home.

          Appellant contends that the following allegations in the affidavit were
insufficient to establish probable cause: (1) the description as to age, height, and
weight did not fit appellant at the time of the offense; (2) the complainant did not
identify appellant as the perpetrator, only as a possible refrigerator delivery person;
(3) that the affidavit did not show how the complainant learned of facts concerning
the appellant’s voice; and (4) it had been three years since the complainant had heard
or possibly seen appellant. 
          In Faison v. State, the search affidavit for blood stated that there had been a
number of sexual offenses in a geographical area; that the defendant was seen by a
guard urinating at 4:00 a.m. in an apartment complex he did not live in; that the
defendant was seen driving in a vehicle similar to one leaving one of the sexual
assaults; that the defendant fit the general description of the rapist by several of the
victims; that the defendant lived near the area where the sexual assaults occurred; and
that the defendant had been convicted of a sexual assault similar to one of the sexual
assaults in this area. 59 S.W.3d 230, 239-40 (Tex. App.—Tyler 2001, pet. ref’d). The
court held that the information contained in the affidavit provided sufficient probable
cause for the issuance of a search warrant for blood. Id.
          Here, the affidavit states that the complainant described the attacker as a white
male, approximately 5'09", 150-155 pounds, brown hair and brown eyes with an age
range of mid-20’s. The affidavit also states that Detective Atkins obtained
information that appellant was a white male, 5'09", 150 pounds, with a date of birth
of June 23, 1962. Although the attacker’s age as estimated by the complainant was
about 10 years younger than appellant’s true age, the remaining physical description
was similar to that of appellant. The affidavit stated that the complainant had
described the attacker as having worn a black ski mask and gloves and having bound
her with duct tape. A San Antonio police report contained information stating that
brown knit gloves, a green ski mask and a roll of duct tape were found in appellant’s
vehicle when he was arrested for burglary of a building. Detective Atkins had
statements from two of the complainant’s neighbors that they had observed a dark
blue 1992-1994 Chevrolet truck located near the complainant’s house at
approximately 4:00 a.m. on June 14, 1997. The San Antonio police report stated that
appellant was in possession of a 1992 green Chevrolet truck on March 5, 1998. The
affidavit stated that the complainant was focused on the attacker’s voice and had
associated the attacker’s voice with the voice of a man who had delivered a
refrigerator to her home. The complainant immediately identified appellant out of a
photo lineup as the person who had delivered her refrigerator and had a voice similar
to the attacker’s voice. The affidavit stated that appellant had worked for a “contract
truck,” that his driving record put him in the Houston and surrounding area, and that
he had a criminal history record consisting of burglaries, assault, forgery, fraud,
dangerous drugs, sex offense, and public order crimes. 
          We find that, although there are some differences in the complainant’s
estimation of the attacker’s age and appellant’s actual age, in the colors of the mask,
gloves, and truck, the magistrate was entitled to draw reasonable inferences from the
affidavit and interpret the affidavit in a common sense and realistic manner. Ramos,
934 S.W.2d at 362-63. Based on the facts that it was dark outside and inside the
house when the attack took place, and that the appellant wore a mask during the
attack, it is a reasonable inference that the description of the colors of some of the
items may not match exactly and that the complainant mis-estimated the attacker’s
age. We conclude that, under the totality of the circumstances, the magistrate had
sufficient evidence linking appellant to the aggravated sexual assault in this same
general area to issue a search warrant allowing police to draw his blood to further
their investigation. 
Staleness
          Appellant asserts that the information contained in the affidavit was stale
because (1) the offense occurred on June 14, 1997; (2) the arrest in San Antonio was
in May 1998; (3) the information regarding appellant’s criminal history was all prior
to 1998; and (4) the photo lineup did not take place until June 16, 2000.
          The concept of staleness is not applicable to an affidavit supporting a search
warrant authorizing a search for and seizure of blood, saliva, and hair. The staleness
rule is concerned with whether items to be searched for will probably be in a
designated place at the time of the proposed search. Rowell v. State, 14 S.W.3d 806,
809 (Tex. App.—Houston [1st Dist.] 2000), aff’d, 66 S.W.3d 279 (Tex. Crim. App.
2001). Blood, saliva, and hair will always be found on or in the body of a suspect. 
As a result, appellant’s staleness argument is without merit. 
          In light of the aforementioned discussion, we are satisfied that the information
contained within the four corners of the affidavit alleged substantial facts establishing
probable cause to obtain a sample of appellant’s blood. See id.
          Appellant’s first point of error is overruled.  
Motion for Discovery
          In his second point of error, appellant contends that the trial court erred in
denying his motion for discovery of the State’s DNA experts’ records, thus violating
his Sixth Amendment right to confront and cross-examine witnesses. A hearing on
appellant’s motion was held and appellant claimed that he had a right to discovery of
the basis of the State’s DNA analysis, including lab notes, photographs, gels, the
basis for statistical analysis and all other information concerning the basis for the
DNA expert’s opinion. 
          The Confrontation Clause provides two rights to criminal defendants: the right
physically to face those who testify against them and the right to conduct
cross-examination. Delaware v. Fensterer, 474 U.S. 15, 18-19, 106 S. Ct. 292, 294
(1985); Shpikula v. State, 68 S.W.3d 212, 220 (Tex. App.—Houston [1st Dist.] 2002,
pet. ref’d). The Confrontation Clause protects a defendant’s trial rights and is
inapplicable to proceedings occurring prior to trial. Pennsylvania v. Ritchie, 480 U.S.
39, 52, 107 S. Ct. 989, 998-99 (1987); Shpikula, 68 S.W.3d at 221. There is no right
to pretrial discovery and “[t]he ability to question adverse witnesses . . . does not
include the power to require the pretrial disclosure of any and all information that
might be useful in contradicting unfavorable testimony.” Pennsylvania, 480 U.S. at
52-53, 107 S. Ct. at 998-99; Shpikula, 68 S.W.3d at 221. Under these authorities, to
the extent appellant sought pretrial production of documents, we conclude that the
Sixth Amendment did not entitle appellant to relief. See Shpikula, 68 S.W.3d at 221. 
          Criminal defendants do not have a general right to discover evidence in the
State’s possession, but they have been granted limited discovery. Shpikula, 68
S.W.3d at 222 (citing Washington v. State, 856 S.W.2d 184, 187 (Tex. Crim. App.
1993)). Article 39.14 prescribes the exclusive manner by which a defendant may
obtain pretrial discovery and provides that a trial court may order the State “before
or during” the trial of a criminal action to produce certain evidentiary items more
fully described in that article. Tex. Code Crim. Proc. Ann. art. 39.14 (Vernon Supp.
2003); Shpikula, 68 S.W.3d at 222. The decision about what is discoverable is
within the trial court’s discretion. Id. Because article 39.14 is the exclusive authority
for appellant to obtain pretrial discovery of items in the State’s possession, the fact
that the trial court did not permit appellant to discover the information sought before
trial was not error. Id. Further, appellant received a copy of the DNA lab report
containing the results of the analysis before trial, an order was signed by the trial
court granting appellant the funds to employ his own DNA expert, and appellant
thoroughly cross-examined the State’s witness who performed the DNA testing. 
          Appellant’s second point of error is overruled.
Sufficiency of the Evidence
          In his third point of error, appellant asserts that the evidence is factually
insufficient to show that he was the assailant.
          In a factual sufficiency review, we examine all of the evidence neutrally and
ask whether proof of guilt is so obviously weak as to undermine confidence in the
jury’s determination or so greatly outweighed by contrary proof as to indicate that a
manifest injustice has occurred. See Zuliani v. State, 97 S.W.3d 589, 593-94 (Tex.
Crim. App. 2003); King v. State, 29 S.W.3d 556, 563 (Tex. Crim. App. 2000). We
must avoid substituting our judgment for that of the factfinder. King, 29 S.W.3d at
563. The factfinder is the sole judge of the weight and credibility of witness
testimony. Johnson v. State, 23 S.W.3d 1, 7 (Tex. Crim. App. 2000). In our review,
we must consider the most important evidence that the appellant claims undermines
the jury’s verdict. Sims v. State, No. 1328-01, slip op. at 6-7 (Tex. Crim. App. Mar.
12, 2003).
          The following evidence supports the jury’s implicit determination that he was
the assailant. The complainant identified appellant out of a photo lineup as the person
who delivered her refrigerator and whom she associated with the assailant. The
complainant’s physical description of the assailant closely resembled that of
appellant. The complainant testified that she recognized the appellant’s voice as
similar to that of a man that had delivered her refrigerator. Evidence was presented
that appellant had worked as a delivery helper on several occasions for an
independent contractor who delivered appliances for Montgomery Ward, which is
where the complainant purchased her refrigerator. Two of the complainant’s
neighbors testified as to the description of a truck that was located near the
complainant’s home at about the time of the assault. The description of the truck was
similar to a truck owned by appellant. Appellant was arrested on another offense and
found to be in possession of gloves, a ski mask, a roll of duct tape and a tool–all
similar to the items used in the current offense. Appellant’s DNA profile was found
to be consistent with the DNA profile of evidence obtained from the complainant’s
night shirt and from the scene of the crime. 
          Appellant argues that the evidence identifying him as the assailant was 
factually insufficient for the following primary reasons:
          •        The complainant’s description of the assailant did not match appellant,
and because her identification of appellant as the assailant did not take
place until three years after the sexual assault, the veracity of such
identification is questionable.
 
          •        The complainant’s identification of appellant as a refrigerator
deliveryman is not a positive identification of appellant as the assailant. 
The complainant could not describe any other deliverymen, and there
was no evidence that appellant worked as a deliveryman.
 
          •        There was no voice identification lineup or comparison evidence.
 
          •        No weapon was introduced into evidence.
 
          •        There was no evidence that appellant’s truck was linked to the offense.
 
          •        None of the State’s witnesses allegedly could identify appellant as the
assailant.
 
          •        The DNA test results did not show appellant was a “match” and the
experts did not identify appellant as the assailant or that the blood tested
belonged to appellant.

          First, the credibility and the weight to be given any witness’s testimony was for
the jury to assess. See Johnson, 23 S.W.3d at 7. Second, after the attack, the
complainant described the assailant to the police, including height, weight, hair color
and estimated age. The complainant testified as to the assailant’s description at trial. 
Third, the complainant immediately identified the appellant out of a photo lineup as
a delivery man that she had associated with the attacker. David Rivas, operations
manager for Hays Home Delivery, which did deliveries for Montgomery Ward,
testified that he had previously met with Detective Atkins. Rivas testified that,
although all their records were destroyed in a flood, appellant may have worked as
a helper for Kenneth Holley on the delivery to the complainant’s house. Rivas also
testified that appellant may have worked as a helper on several other occasions. John
Kelly, a former home delivery manager for the Montgomery Wards warehouse,
testified that he knew appellant to be a helper for Kenneth Holley on home deliveries. 

          Fourth, although no voice identification lineup or comparison evidence was
introduced, the complainant testified that she associated the voice of the attacker with
one of the deliverymen. The complainant testified that they both had a strong
southern drawl and that the voice sounded similar. Fifth, although the actual weapon
used in the sexual assault was not recovered and introduced into evidence, the
complainant testified that the appellant held a knife up and threatened to hurt her
child if she did not quiet down. The complainant stated that she was in fear of death
or serious bodily injury and described the knife as being double-bladed and jagged. 
Detective Atkins testified that a knife, such as that described by the complainant,
would be capable of causing death or serious bodily injury. Sixth, James Kincaid,
testified that he lived near the complainant and that on June 14, 1997, at
approximately 4:00 a.m., he and Christopher Farrar returned home and noticed a truck
parked near the complainant’s house. Kincaid described the truck as a dark blue
1992–1994 Chevrolet model. Christopher Farrar, also testified that he saw a
suspiciously parked blue Chevrolet truck at around 4:00 a.m. on June 14, 1997 near
the complainant’s house. 
          Seventh, appellant argues that none of the State’s witnesses, including
Detective Atkins, the serologist, the DPS analyst, the nurses who drew his blood, and
the DNA expert could identify him as the assailant. Each of these witnesses testified
as to their participation and knowledge regarding this case. None of them was an
eyewitness to the attack. Debbie Hammers testified that before drawing appellant’s
blood, she checked his identification and verified that the blood taken was from
appellant. Detective Atkins and Hammers’ supervisor, Melinda Marler, were present
and witnessed Hammers’ draw blood from the appellant. The DPS analyst testified
that she tested the blood that was identified as appellant’s blood. The DNA expert,
Dr. Eisenberg, testified as to DNA identification, that he reviewed the DPS lab report
on the results of appellant’s DNA testing, that proper protocols were used, and that
the results were reliable. Each witness testified regarding their part in the chain of
custody of the blood and that the blood tested belonged to appellant. 
          Finally, appellant argues that the DNA results did not show appellant was a
“match.” Several witnesses testified as to how DNA testing is done and to the
reliability of the testing. Some witnesses used the word “match” and others used
words such as “consistent with” to describe the comparison of the DNA obtained
from the victim’s carpet fibers and clothing to the DNA from appellant’s blood. 
Evidence was presented that there was a 1 in 120 billion chance for caucasians that
these samples would randomly match. 
          Resolving any factual disputes was for the jury. See id. After examining all
of the evidence neutrally, we hold that the evidence on which appellant relies does
not render the remaining evidence factually insufficient to support the verdict. 
          Appellant’s third point of error is overruled.           
Photo Lineup
          In his fourth point of error, appellant contends that the trial court erred in
allowing the in-court identification of appellant because it was the fruit of an
impermissibly suggestive out-of-court identification procedure. 
          Appellant failed to object at trial, and thus has failed to preserve error on
appeal. Tex. R. App. P. 33.1(a)(1)(A); Idowu v. State, 73 S.W.3d 918, 922-23 (Tex.
Crim. App. 2002).
          Appellant’s fourth point of error is overruled.
Admission of Blood Sample
          In his fifth point of error, appellant contends that the blood sample should have
been excluded from evidence due to the failure to admit Exhibit 58 into evidence. 
Due to appellant’s limited briefing and argument of this point, we are construing his
argument to mean that appellant is asserting that, because the blood used for testing
was not properly admitted into evidence, the DNA results cannot be used to prove his
guilt. 
          Four vials of blood were drawn from appellant. The State offered the four vials
as State’s Exhibit 52. Christi Winsatt, a criminalist at the DPS crime lab, testified
that she performed a DNA analysis on blood from one of the four vials, and the other
three vials were not used. Appellant’s counsel objected to the other three vials as not
relevant. State’s Exhibit 52 was received in evidence. The court then instructed
Winsatt to remove the three vials that she did not use. Although the record is unclear
as to whether the three unused vials were marked as State’s Exhibit 58 or whether the
one used vial was marked as State’s Exhibit 58, both the appellant’s and the State’s
briefs state that the one vial used in the DNA testing was re-marked as State’s Exhibit
58. State’s Exhibit 58 was marked, but was not admitted into evidence.
          Even if the blood was not admitted into evidence, there is no requirement that 
it be admitted before an expert can testify as to the results of DNA tests on the blood.
The facts or data in the particular case upon which an expert bases an opinion or
inference may be those perceived by, reviewed by, or made known to the expert at or
before the hearing. Tex. R. Evid. 703. If of a type reasonably relied upon by experts
in the particular field in forming opinions or inferences upon the subject, the facts or
data need not be admissible in evidence. Id. Evidence that is not objected to and that
the trial court and the parties treat as admitted is, for all practical purposes, admitted. 
See Killion v. State, 503 S.W.2d 765, 766 (Tex. Crim. App. 1973); see also Tex.
Health Enters. v. Tex. Dep’t of Human Servs., 949 S.W.2d 313, 314 (Tex. 1997). 
          Here, Winsatt testified that she performed a DNA analysis on appellant’s
blood. Winsatt testified extensively regarding the details and procedures of
performing a DNA analysis. Further, four blood vials were shown before the jury and
had been marked as an exhibit. Appellant’s counsel objected that the three unused
vials were not relevant; he did not object to the vial used in testing. We find that, for
all practical purposes, the vial used in testing was treated as admitted, although it is
unclear whether it was actually admitted into evidence. See id. Nevertheless, it was
not a requirement that the blood vial be admitted into evidence in order for the results
of the DNA testing to be admissible.
          Appellant’s fifth point of error is overruled.
Chain of Custody
          In his sixth point of error, appellant argues that the blood sample should have
been excluded from evidence, claiming that there was a break in the chain of custody. 
Appellant asserts that the State did not establish a proper chain of custody.
          It is within the trial judge’s discretion to determine the sufficiency of a
predicate, and, absent an abuse of discretion, we will not reverse the trial court’s
judgment. Smith v. State, 683 S.W.2d 393, 405 (Tex. Crim. App. 1984).
          Detective Atkins testified that she observed as appellant’s blood was drawn by
Debbie Hammers, a phlebotomist, at Northeast Medical Center. Melinda Marler,
Hammers’ supervisor, also observed as Hammers drew appellant’s blood. Hammers
checked appellant’s identification before drawing his blood. The four blood vials
were sealed and marked with Hammers’ initials. The four sealed vials were turned
over to Atkins, who then took the vials to the Alvin Police Department and stored
them in the refrigerator in the evidence room on the same day. The following day,
Atkins took the four blood vials to the Texas DPS lab in Houston and turned the vials
over to the lab for DNA analysis. Christi Winsatt testified that, when evidence is
received at the Texas DPS lab, it is assigned a case number and the evidence
technician looks for signs of tampering. If there are signs of tampering, a notation is
made on the evidence. Blood samples are then placed in a locked refrigerator until
they are retrieved by an analyst for testing. The analyst checks the evidence for signs
of tampering and if there are any, makes a notation. Winsatt testified that, in this
case, there were no notations that the evidence had been tampered with and the tubes
were sealed when she began her DNA analysis.
          Appellant contends that this chain of custody is insufficient because (1)
Hammers and Marler could not identify appellant in court, (2) Atkins could not
identify the exact person she turned the vials over to at the DPS crime lab, and (3)
that contamination, tampering, or alteration could have occurred. We disagree.
          If a substance is properly identified, most questions concerning care and
custody go to the weight to be given the evidence, not to its admissibility, unless there
is a showing that the substance was tampered with or changed. Gallegos v. State, 776
S.W.2d 312, 315 (Tex. App.—Houston [1st Dist.] 1989, no pet.). When the State
shows the beginning and the end of the chain of custody, any gaps in between go to
the weight rather than admissibility, particularly if the chain of custody through to the
laboratory is shown. Id. at 315-16.
          Here, the State showed a complete chain of custody from the first step, the
drawing of appellant’s blood, to the final step, turning the blood over to the DPS lab. 
As there was no evidence of tampering, any gaps alleged by appellant went to the
weight of the evidence, not its admissibility.
          Appellant’s sixth point of error is overruled.
Ineffective Assistance of Counsel
          In his seventh point of error, appellant argues that his trial attorney rendered
ineffective assistance of counsel by failing to (1) subpoena and call witnesses for the
motion to suppress, (2) obtain discovery, (3) have his DNA expert testify at trial, (4)
obtain a ruling on his motion for continuance, (5) act as he stated that he would to the
court, and (6) call witnesses to testify at the punishment phase of trial.
          To determine whether a defendant has been denied effective assistance of
counsel, we follow the standard set forth in Strickland v. Washington, 466 U.S. 668,
687, 104 S. Ct. 2052, 2064 (1984). First, appellant must demonstrate that counsel’s
representation fell below an objective standard of reasonableness under prevailing
professional norms. Strickland, 466 U.S. at 688, 104 S. Ct. at 2064; Howland v.
State, 966 S.W.2d 98, 104 (Tex. App.—Houston [1st Dist.] 1998), aff’d, 990 S.W.2d
274 (Tex. Crim. App. 1999). Second, appellant must establish that counsel’s
performance was so prejudicial that it deprived him of a fair trial. Howland, 966
S.W.2d at 104. Thus, appellant must show that a reasonable probability exists that,
but for counsel’s unprofessional errors, the result of the proceeding would have been
different. Strickland, 466 U.S. at 694, 104 S. Ct. at 2068; Howland, 966 S.W.2d at
104. Appellant has the burden to establish both of these prongs by a preponderance
of the evidence. Jackson v. State, 973 S.W.2d 954, 956 (Tex. Crim. App. 1998);
Davis v. State, 830 S.W.2d 762, 765 (Tex. App.—Houston [1st Dist.] 1992, pet.
ref’d). We cannot speculate beyond the record provided. Jackson v. State, 877
S.W.2d 768, 771 (Tex. Crim. App. 1994); Gamble v. State, 916 S.W.2d 92, 93 (Tex.
App.—Houston [1st Dist.] 1996, no pet.). Appellant must overcome the presumption
that trial counsel’s strategy was sound. Gamble, 916 S.W.2d at 93.
          An appellant “making a claim of ineffective assistance must identify the acts
or omissions of counsel that are alleged not to have been the result of reasonable
professional judgment.” Strickland, 466 U.S. at 690, 104 S. Ct. at 2066. Any
allegation of ineffectiveness must be firmly founded in the record, and the record
must affirmatively demonstrate the alleged ineffectiveness. Thompson v. State, 9
S.W.3d 808, 813 (Tex. Crim. App. 1999). No motion for new trial was filed. The
record is silent as to what appellant’s counsel’s trial strategy was. To find that trial
counsel was ineffective based on any of the asserted grounds would call for
speculation, which we will not do. Gamble, 916 S.W.2d at 93.
          Appellant’s seventh point of error is overruled. 
Judicial Misconduct
           In his eighth point of error, appellant alleges that the trial court committed
judicial misconduct by withholding its ruling regarding a Kelly-Daubert issue. 
          An evidentiary hearing was held outside the presence of the jury, to make 
determinations about (1) the reliability of DNA testing, (2) that the underlying
scientific theory is valid, (3) that the technique applied to the theory is valid, and (4)
that the technique was properly applied in this case. Christi Winsatt testified on voir
dire examination for the State. Following Winsatt’s testimony, the following
exchange took place, which appellant complains constitutes judicial misconduct: 
The Court: Do you think that you have—do you think—you can go
search your heart tonight and this afternoon; have you, in your mind,
satisfied the qualifications of Kelly as to this person as to the DNA?

          Prosecutor: As to the DNA, I will go and search my conscience.
 
The Court: If you tell me that, that means you’ve put all your eggs in
one basket, doesn’t it? 

          Prosecutor: I said, “I will.”

          The Court: Oh, you will?

          Prosecutor: As the—as the Court suggested.
 
The Court: All right, Counsel, 8:15 in the morning. Be ready to go back
to continuing examination of the witness, Atkins and I’ll rule sometime
tomorrow before you put your witness back on.
            
          The following afternoon, the State informed the court that it had secured an
expert witness, Dr. Eisenberg, to testify regarding DNA. Appellant’s counsel
specifically stated that he did not have any objections since the prosecutor was calling
this witness at his request. Dr. Eisenberg then testified outside the presence of the
jury on voir dire examination and was cross examined by appellant’s counsel. At the
conclusion of Dr. Eisenberg’s testimony, the court stated that it was going to allow
Dr. Eisenberg to testify before the jury and asked appellant’s counsel if he had any
objections he wanted to state. Appellant’s counsel stated that he did not have any
objections. 
            Appellant had several opportunities, but failed to object at trial. Therefore,
appellant has failed to preserve error on appeal. Tex. R. App. P. 33.1(a)(1)(A); Idowu,
73 S.W.3d at 922-23.
          Appellant’s eighth point of error is overruled.
Evidence of Prior Crimes
          In his ninth point of error, appellant asserts that it was improper for the State
to admit evidence of prior crimes during the punishment phase when the State later
abandoned certain enhancements. Appellant contends that it was error was to allow
the jury to hear of the existence of the abandoned enhancements.
          For purposes of assessing punishment, 
evidence may be offered by the state and the defendant as to any matter
the court deems relevant to sentencing, including but not limited to the
prior criminal record of the defendant . . . any other evidence of an
extraneous crime or bad act that is shown beyond a reasonable doubt by
evidence to have been committed by the defendant or for which he could
be held criminally responsible, regardless of whether he has previously
been charged with or finally convicted of the crime or act. 

Tex. Code Crim. Proc. Ann. art. 37.07 § 3(a) (Vernon Supp. 2003); Fields v. State,
1 S.W.3d 687, 688 (Tex. Crim. App.1999). Therefore, the State could introduce
evidence of prior convictions regardless of whether or not they were alleged for
enhancement.
          Appellant’s ninth point of error is overruled. 
Conclusion
          We affirm the judgment of the trial court.
 
 
                                                             Laura C. Higley 
                                                             Justice

Panel consists of Justices Taft, Keyes, and Higley.
Do not publish. Tex. R. App. P. 47.2(b).