**Opinion filed October 13, 2011**



In The

# Eleventh Court of Appeals

_____

## No. 11-10-00001-CR

_____

**JEINA HOGAN, Appellant**
**V.**
**STATE OF TEXAS, Appellee**

**On Appeal from the 35th District Court**
**Brown County, Texas**
**Trial Court Cause No. CR18025**

## MEMORANDUM OPINION

Jeina Hogan was a bank teller at the Walmart branch of Citizens National Bank in Brownwood, Texas. She was indicted for the offense of theft of over $1,500 and under $20,000, a state jail felony. TEX. PENAL CODE ANN. § 31.03 (Vernon 2011). The indictment alleged that she unlawfully appropriated various amounts of currency between April 19 and May 25, 2005, pursuant to one scheme and continuing course of conduct. *Id.* § 31.09. The jury convicted Hogan of the offense and assessed her punishment at one year confinement in the Texas Department of Criminal Justice, State Jail Division. Pursuant to the jury's recommendation that imposition of the sentence be suspended and that appellant be placed on community supervision, the trial court sentenced appellant to five years community supervision and ordered restitution of $18,829.

Appellant raises two issues on appeal: (1) the evidence was insufficient to support her conviction and (2) the trial court abused its discretion in denying her motion for mistrial when the sole investigator for the State violated her motion in limine.  We affirm.

*Standard of Review*

The Texas Court of Criminal Appeals concluded in *Brooks v. State*, 323 S.W.3d 893 (Tex. Crim. App. 2010), that there is "no meaningful distinction between the *Jackson v. Virginia*[1] legal-sufficiency standard and the *Clewis*[2] factual-sufficiency standard." *Brooks*, 323 S.W.3d at 902.  The *Brooks* court held that the *Jackson v. Virginia* standard is the "only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt." *Id.* at 912.  Under this standard, we must review all of the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  *Jackson*, 443 U.S. at 319.

The jury, as the finder of fact, is the sole judge of the weight and credibility of the witnesses' testimony.  TEX. CODE CRIM. PROC. ANN. art. 36.13 (Vernon 2007), art. 38.04 (Vernon 1979).  The jury has the responsibility to resolve conflicts in the testimony and to draw reasonable inferences from basic facts to ultimate facts.  *Jackson*, 443 U.S. at 319; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).  In our review, we must determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict.  *Hooper v. State*, 214 S.W.3d 9, 16-17 (Tex. Crim. App. 2007).  The standard of review is the same for direct and circumstantial evidence.  Circumstantial evidence is as probative as direct evidence in establishing the guilt of a defendant.  *Clayton*, 235 S.W.3d at 778; *Hooper*, 214 S.W.3d at 13.

*Background Facts*

Appellant began her employment as a part-time teller at the branch bank on February 28, 2005, and she was terminated on June 2, 2005.  During her period of employment, the branch bank experienced a series of missing cash amounts, which we summarize as follows:

> Three tellers checked out ("bought") straps of cash from the vault that were missing cash:  $1,000 from one strap, $2,000 from another, and $400 from a third strap.

---

[1]*Jackson v. Virginia*, 443 U.S. 307 (1979).

[2]*Clewis v. State*, 922 S.W.2d 126 (Tex. Crim. App. 1996).

Appellant had written $7,000 on her balancing sheet for June 1, but a surprise cash count of appellant's drawer revealed that there was only $2,000 in her drawer.

A number of appellant's daily teller tapes had been cut and spliced, leaving out a transaction, and the transaction was written in at the end of the tape as a cash-out (purported transaction with a customer). On May 23, for example, the tape had been cut and then spliced together, omitting Transaction No. 95 that was listed at the end of the tape as a $4,000 check that was cashed. On May 4, there was an unexplained cash-out of $2,000, and on April 26, an unexplained cash-out of $1,000. The bank was unable to verify the listed cash-outs as valid transactions.

The bank was unable to verify a number of cash-outs on other daily tapes of appellant.

The executive vice president of operations for the bank found a strap of $2,000 in one hundred dollar bills behind a box holding appellant's teller tickets. According to him, there was no reason for that cash to be hidden there.

Brenda Hicks, the branch manager, testified that the branch had not had straps with missing amounts of cash before the period of appellant's employment nor had the branch had so many problems of missing cash. Troy Keith Clark, the executive vice president, testified that the bank had not had any further major losses since appellant was terminated.

Debra Dawson, a teller at the branch bank, testified that appellant was still in high school when she worked part-time at the branch. Dawson described appellant as being very intelligent, learning the job quickly, and working well with the customers. Carol Byerly, another full-time teller, also testified that appellant was a very fast learner and a nice person.

Dawson described the teller's job. A teller would have $15,000 in his or her drawer at the beginning and end of each day. The teller would get stacks of additional cash out of the vault at the beginning of the day for handling the day's transactions. When the teller checked out a stack (referred to as a "strap") of bills from the vault, the term was that the teller "bought" that strap to put in the teller's drawer. The amount of bills in a strap would not vary. For example, a strap of $50 bills would have twenty $50 bills or $1,000. At closing, the teller would "sell" excess cash back to the vault. The teller's machine would reflect the straps that were bought and sold during the day, recording on a tape the in-and-out system of checking out (buying) and returning (selling) straps of cash.

According to Dawson, newer employees were very cautious about the money they got from the vault to put into their drawer, and they would never get enough to handle transactions during the day. When appellant was new, she would not buy enough from the vault. But during the month that Dawson was in charge of the vault, Dawson noticed that appellant was "buying a tremendous amount of money and then at the end of the night selling a tremendous amount of money back." Byerly also noticed the change over time in appellant's transactions with the vault. When appellant first started as a teller, appellant would buy very little cash from the vault. But toward the end of her employment, appellant would buy large sums of money even on days when the tellers were not busy, and then appellant would say that she had not meant to buy that much cash and would sell straps back to the vault. Appellant would buy large sums in the afternoon that were more than sufficient for her needs as a teller.

Dawson testified that, at first, it did not take appellant very long to balance her drawer and then leave at the closing time of 7:00 p.m. But toward the end of her employment, appellant took a lot more time to balance out her drawer. Dawson acknowledged that, at times, all the tellers might have a problem, and if it was getting too late, a teller would wait until the next morning to find the mistake. Appellant had the teller station to the right of Dawson, and Dawson recalled that appellant's station was not one of the busier stations. Yet, it took appellant more time to check out the longer she worked there.

Dawson testified that one day she bought a strap of bills from the vault that was short some bills. Dawson said that she always verified the amount in a strap before putting the strap into her drawer, as the bank's policy required. She immediately reported the shortage to the tellers' supervisor, Hicks. The strap was short $400. Dawson explained that the shortage of such an amount had never happened during the time she had been working as a teller. She said that a strap might have been a dollar over or there might have been a $20 bill mixed in for a $50 bill but that there was never a shortage in a large amount such as $400.

Dawson stated that the vault had a combination lock, a key, and a timer. There was one vault at the branch. Two persons were required to open the vault: one person had a key and the other person knew the combination. When a teller went to work at the branch bank, the teller was assigned a key or a combination. The two-person vault team was changed every month. Dawson had been assigned a key that she kept the entire time she was employed. Because she was a part-time teller, appellant was never a member of the vault team.

4

Dawson was one of two people in charge of the vault when she bought the strap that was missing $400 in May. She said that a courier would bring cash from the main bank to the branch bank if additional cash was needed and that the courier might bring up to $400,000 to the branch. There were usually four or five tellers working at the branch bank, and the hours of business were from 10:00 a.m. to 7:00 p.m.

Dawson testified that the two tellers who were in charge of the vault did not take the straps apart and count the bills in the strap when they were received from the main bank. The straps had already been counted and initialed twice verifying that two people had counted the bills before the straps had left the main bank to be delivered to the branch bank. Dawson acknowledged, however, that the vault was left unlocked from 9:00 a.m. until 7:00 p.m. and that anyone could have gone into the vault during that time. Dawson also said that there were video cameras on the vault and in the teller area.

At the end of the day, a teller would count the money in that teller's drawer. If the money was over or under the amount that teller was supposed to have, the teller would ask another teller or the supervisor, Hicks, to also count the money in the drawer. The teller would fill out a cash-over or a cash-under ticket and then put the teller's initials or teller number on the ticket. Each teller had a drawer in the vault that only that teller had a key to, and the teller would put her drawer into the vault drawer and lock it in the vault drawer. Hicks was the only other person who could unlock the vault drawer to take out a teller's drawer.

Dawson described the teller machine that generates a teller tape reflecting the transactions during the day. The paper tape in the teller machine is a little wider than an adding machine tape and is in duplicate form of a white tape and a yellow tape. At the end of the day, the teller would tear her tape off, roll it up, and place the tape in a drawer that was then locked. Each tape was numbered with a particular teller's number. Appellant was Teller No. 44.

If a teller's drawer was in balance or only slightly out of balance at the end of the day, the teller normally would not ask another teller to also count the first teller's drawer. Often, a teller would find the error and reconcile the balance in the drawer the next morning. It was in the cases of a large discrepancy that a teller would ask another teller to count the cash in the drawer.

Dawson testified that there was another time when a teller might have their drawer checked by another teller: a surprise cash count. On occasion, Hicks would tell the tellers at the beginning of the day that they were going to do a surprise cash count of another teller's drawer.

5

Byerly testified that she assisted Hicks in performing a surprise cash count of appellant's drawer on June 2 and that they found the drawer was short $5,000 in cash. Hicks counted it first, and then Byerly recounted the cash.

Byerly identified State's Exhibit No. 25 as being appellant's teller tape for June 1. Appellant had written down $7,000 on her balancing sheet, but there was only $2,000 in the drawer. Therefore, the tape did not show that appellant's drawer was out of balance. Dawson testified that, as long as a teller reported that the drawer was in balance, that teller's drawer would not be counted by another person until there was a surprise cash count.

Clark, executive vice president of Citizens National Bank, was in charge of operations for the bank. He confirmed the duties of a teller as Dawson had related. Each teller was responsible for the cash in her drawer. The teller had sole access to the drawer, and the teller had to go through certain balancing procedures every day. Each day the teller would buy money from the vault for the day's transactions with customers. The teller had a certain limit on how much money the teller was supposed to keep in the drawer, and if the drawer had more than that amount at the end of the day, the teller had to sell that overage back to the vault. Tellers received on-the-job training by sitting with an experienced teller and watching the experienced teller at first. The new teller would then be given a drawer and begin handling transactions under the watchful eye of an experienced teller. The bank has a teller manual that gives the rules and procedures for tellers. Clark testified that appellant was given a copy of the manual when she started work at the Walmart branch.

Clark began his banking career in 1969 and joined Citizens National Bank in 1985. His opinion was that the accountability procedures at the bank were at least as stringent as they were in the other banks where he had worked. However, he acknowledged that no system was perfect and that there were always weaknesses and need for improvement. At the time of trial, the bank no longer used the paper tape system on teller machines. The bank had changed to an automated teller operation that tied into the bank's computer system. Except for his comment that the bank had changed systems, Clark's testimony related to the situation at the time that appellant worked as a teller.

Clark explained that, even under the new system, a teller still uses an in-ticket for cash coming in from a customer and an out-ticket for cash given to a customer. There is an original and one copy of each ticket. The original goes to the proof department where that department

can actually prove every transaction that goes through the bank, such as a loan payment, a deposit, or cash for a check. The copy is kept by the teller for reconciling the cash in the drawer at the end of the day. The teller begins with the cash at the start of the day, adds the cash that came in, subtracts the cash that went out according to the tickets, obtains an amount that should be in the drawer, and then counts the cash in the drawer to see if it balances to that amount.

Clark described how the teller machine made a top copy that would be torn off and might go with the transaction, but the bottom yellow copy was a continuous tape of every transaction, recording all cash taken in and paid out. He said that there was not any reason for the underlying tape to be cut. The tape was torn off at the end of the day, rolled up, and kept as a permanent record of the bank. The top copy was white, and the continuous copy was yellow. A customer might be handed a white copy as a receipt for a deposit, for example. Clark stated that it was not uncommon for the teller to tear off a white copy on a frequent basis. Clark testified that, in addition to the teller machine tape reflecting all the cash transactions during the day, there would also be cash tickets for the cash transactions. The cash tickets and the tape should always be in balance.

Clark described how a teller's drawer could show it was in balance if the teller created false tickets for the same amount of money stolen by a teller; however, the error would ultimately be caught on the bank's general ledger.

Clark and Hicks identified a number of the State's exhibits as being appellant's balancing sheets and transaction sheets and part of the bank's business records. The odd-numbered exhibits were the full-sized balancing sheets for a particular day and the even-numbered exhibits were the transaction tapes for each day.

Clark admitted that, during the period that appellant was a teller, a teller could check out (buy) a strap and then later return it, saying that he or she had never opened the strap despite a bank policy to the contrary. That strap could still have the initials of the two people who had verified the strap earlier and not be recounted when it was returned to the vault. After appellant was no longer a teller, the bank started enforcing its procedure of requiring that a teller initial and date a strap that the teller returned to the vault, thereby taking responsibility for the accuracy of the amount of cash in the strap. Clark stated that the policy was in place during the time that appellant was a teller; however, the procedure was not always followed. He also explained that

the vault was not a walk-in vault; it was a locked cabinet about four feet wide, two feet deep, and four feet high.

In response to a telephone call from Hicks, Clark went to the branch. He and Hicks determined that several straps contained less cash than they should have; the shortage was $3,400. Clark recalled that they then counted appellant's drawer and found that more money was missing. Clark said that he then contacted Bobby Duvall with the Brown County Sheriff's Department.

Clark testified that they then researched the records trying to rebuild each transaction that was in question. That included pulling all of the teller tapes and looking at all the general ledgers and supporting documents. He found that there was a pattern in the teller tapes. Clark found that there were tapes of appellant that had pieces cut out of them and had been taped back together, "which [was] highly unusual." Clark also said that there were exceptions noted on the general ledger and the balancing sheets. There were transactions that had not cleared and required further research.

Clark was questioned about a number of appellant's teller tapes for different days. For the date May 23, the tape had been torn and then spliced back. Transaction No. 94 was immediately before the splice, and Transaction No. 96 was immediately after the splice; Transaction No. 95 was missing. Clark said there was no legitimate reason for a teller to remove a transaction from the tape. Transaction No. 95 did show up at the end of the tape in the total for the day as a $4,000 check that was supposedly cashed. Clark said that the bank was not able to substantiate the $4,000 cash-out for appellant reflected as Transaction No. 95.

Clark also testified about appellant's teller tape dated May 4. Again, the teller tape had been cut and then pasted back together. In State's Exhibit No. 18, Transaction No. 59 was missing where the tape was spliced but was listed as a $2,000 cash-out on the day's totals. Appellant's teller tape for April 26 had been cut with Transaction No. 75 being eliminated and then listed in the day's totals as a cash-out of $2,000. Appellant's teller tape for April 25 had been cut with Transaction No. 97 being eliminated and then listed in the day's totals as a cash-out of $1,000. Clark also testified as to an additional number of cut tapes where transactions were missing and then listed as cash-outs at the end of the day.

Clark stated that the tape cuts and the listing of the missing transactions as cash-outs at the end of the tape was a method of creating a false transaction in order to conceal money that

was actually missing from the drawer's balance. He could not think of another possible explanation. The tape would appear to be in balance at the end of the day, but the missing money would show up on the general ledger.

Clark testified as to a number of appellant's teller tapes where the tapes were not cut and transactions were listed but where the cash-outs could not be verified. Clark pointed out that appellant's teller tapes reflected a pattern of the amounts of missing money starting small and increasingly getting larger. In addition to the amounts reflected on the cut tapes and cash-outs that could not be verified, there also was the $5,000 amount that was missing when the surprise cash count was made of the cash in appellant's drawer.

Clark testified that the bank's loss was approximately $18,400, which included the $3,400 missing from the straps in the vault, the $5,000 missing from appellant's drawer when the surprise cash count was done, and the questionable transactions on appellant's teller tapes. Clark also stated that, when he looked through appellant's work area, he found a strap of $2,000 in one hundred dollar bills behind a box holding appellant's teller tickets. According to Clark, there was no reason for that cash to be hidden there. The cash should have been placed in appellant's drawer.

Clark testified that there were three cameras focused on the tellers and one camera focused on the vault. However, during the period that appellant was a teller, the camera system was not working. The cameras were running, but they fed into a recorder, which was not working.

When Hicks learned that $5,000 was missing from appellant's drawer on June 2, she called Kim Campbell in addition to her call to Clark. Because of a shortage of tellers, Hicks had not been able to research shortages and review appellant's teller tapes. Hicks testified that she, Campbell, and Margaret Pritchard examined all of appellant's teller tapes and then prepared a report that was given to Chief Deputy Bobby Duvall in the course of the bank's investigation. The report contained a list of transactions that had been cut from appellant's teller tapes or that were unreconciled. The total dollar amount of those items exactly matched the deficiencies that Hicks had been carrying on the general ledger until she had time to research them.

Hicks stated that she prepared a cash balancing sheet for the branch each day. To prepare a cash balancing sheet, Hicks would add all the cash-ins of all the tellers, all the cash-outs of all the tellers, and all the ending cash of all the tellers. Hicks testified that, with the employees other

9

than appellant, she did not have any major missing amounts of cash or shortages that were not resolved.

Campbell was the operations officer and assistant cashier at Citizens National Bank. She was hired in the main bank in 1981 and had been in banking twenty-eight years. Campbell's duties included balancing what tellers do back to the general ledger; taking care of the cash vault; ordering cash; shipping cash; and handling wire transfers, safety deposit boxes, and savings bonds. Campbell confirmed that everything a teller did during the day was on the tape. Customers' account numbers and what the teller did for them – took a deposit, cashed a check, gave change, took a loan payment, or anything else the customer needed – would be on the tape. She explained the process of the teller making two-part tickets with the teller keeping one copy and the other going through the proof department with the transaction. She also explained how she compared the teller tapes to the tickets to the general ledger.

Campbell testified that she discovered discrepancies on appellant's tapes. Most were pink slips that appellant made, indicating that she gave cash out to a customer. However, the hard copy of that ticket never went through the proof department. Therefore, there was no proof of an actual transaction with a customer. As Campbell stated, "[Appellant] just took the cash out, made a ticket so that her cash drawer will balance; but it's not going to balance with the general ledger."

Campbell also expressed her opinion that there was no legitimate reason for transactions having been cut out of appellant's teller tapes and the tapes then taped back together. Campbell testified that Transaction No. 97, a cash-out ticket for $1,000 that was cut from appellant's April 25 tape, had never been proved as a transaction with a customer. On appellant's May 23 tape, Transaction No. 95 was missing where the tape had been cut and then listed as a cash-out of $4,000. Campbell concluded by stating that the bank had filed a loss report with the Federal Reserve and that the bank's loss was $18,829.

Chief Deputy Duvall testified that he was asked by Sheriff Bobby Grubbs to conduct an investigation for the bank. Chief Deputy Duvall reviewed his experience as an investigator. He worked with the Department of Public Safety for over thirty years: eight and one-half years on highway patrol, ten years as a narcotics agent in San Antonio, seven years as a field supervisor in Texarkana, three years as a district captain in Midland, and the last three years as a commander in the headquarters in Austin for the narcotics service. He stated that he had interviewed

hundreds and perhaps thousands of witnesses. As to financial investigations, he had assisted the Internal Revenue Service in working on financial crimes in San Antonio. They would review ledger books, bank receipts, credit card receipts, and other financial records.

Chief Deputy Duvall stated that he took notes during his investigation for the bank but that he destroyed his notes after he incorporated them in his report to the bank. He said that he interviewed Clark, Campbell, Hicks, Byerly, Dawson, and appellant.

Chief Deputy Duvall contacted appellant on June 2, and she agreed to come in for an interview that day. She was accompanied by her grandmother. Chief Deputy Duvall told her that $8,400 was missing from the bank and that that included $5,000 from her cash drawer and $3,400 from the straps. Chief Deputy Duvall said that appellant denied any knowledge of the missing currency.

Chief Deputy Duvall stated that he asked appellant questions about her job, including how she got money from the vault, how she worked with customers, how she kept her balance correct during the day, and how she reconciled the records if she was short of money at the end of the day. When he asked her about how shortages were handled, appellant said, "[T]hey just make it happen where it all came out okay." She then added that she did not take any money and that "[t]hey must have their problem somewhere else." Appellant claimed that she was not aware how things worked out when her drawer was short. She stated that the shortage was adjusted in the proof department but that she did not know what the proof department was.

Chief Deputy Duvall testified that, at one point, appellant offered to pay the money back. The only figure that he had discussed with her was $8,400. He stated that appellant offered to pay the money back another time during the interview. When he asked appellant about the $5,000 that was missing from her cash drawer, she could not explain the shortages. She only said that a customer had come in to cash a $5,000 check and perhaps that was when the shortage occurred.

On June 3, appellant came in for a second interview with her mother and her grandmother. Chief Deputy Duvall informed appellant that this was a criminal investigation, that she was free to come and go as she liked, that she was free to have an attorney, but that he wanted to interview her alone. She refused and left. But, a few minutes later, she came back and asked to be reconsidered for the interview. Chief Deputy Duvall said that he allowed the family members to be with her during the interview.

11

Appellant began the second interview by saying that she thought she knew where the money went. She stated that there was a new teller named Jennifer that had worked appellant's drawer on May 27 and that perhaps the money was taken at that time. Chief Deputy Duvall stated that he developed Jennifer as a suspect at that point but that, ultimately, he concluded that Jennifer was not a valid suspect.

Chief Deputy Duvall said that appellant also suggested that Hicks might have taken the money when appellant had to go to the restroom. Appellant claimed that she was not required or trained to report inconsistencies to her supervisor; however, Chief Deputy Duvall knew that that was inconsistent with the bank's policy manual for tellers. It was also inconsistent with some of appellant's earlier answers. Chief Deputy Duvall said that appellant took no responsibility for the shortages or for reconciling the balance in her drawer. Chief Deputy Duvall said that he told appellant that "it was clear to [him] that she was not at all truthful in her responses." At that point, appellant's attorney made an objection, which the court sustained, and then he requested an instruction, which the court gave. However, the court denied appellant's motion for a mistrial.

Chief Deputy Duvall said that his investigation did not end with the second interview. He continued to examine the teller tapes, review the bank's policies, and conduct additional interviews with Hicks, Byerly, and Campbell. Chief Deputy Duvall said that he looked at the teller tapes and balancing sheets of appellant for the period of April 1, 2005, through May 31, 2005. Chief Deputy Duvall concluded his investigation within a week of June 6. As to his interviews, Chief Deputy Duvall stated that "Brenda Hicks'[s] demeanor was professional and informative fully. [Appellant's] demeanor was courteous and evasive completely."

### Sufficiency of the Evidence

In challenging the sufficiency of the evidence, appellant points out that bank straps were handled by any number of people who could have taken currency from the straps: those who counted and strapped the cash when it came from the Federal Reserve, the people who gave the cash to couriers for delivery to the branch bank, the couriers who took the cash straps to the branch, and the receiving branch tellers who did not count the currency in the straps when it arrived at the branch. Appellant argues that no one saw her cut her teller tapes despite her working within a short distance of other tellers. Appellant also characterizes Chief Deputy Duvall's investigation as being "woefully inadequate."

12

In effect, appellant attempts to resurrect the "reasonable hypothesis analytical construct" that was used in circumstantial evidence cases prior to *Geesa v. State*, 820 S.W.2d 154 (Tex. Crim. App. 1991). Under the reasonable hypothesis analytical construct, the State, in circumstantial evidence cases, had to exclude all reasonable hypotheses, other than the defendant's guilt, in order for the evidence to be legally sufficient. *Geesa*, however, brought to an end the requirement that, in circumstantial evidence cases, appellate courts must utilize the "reasonable hypothesis analytical construct." 820 S.W.2d at 155.

The court in *Geesa* explained, however, that the abrogation of the reasonable hypothesis analytical construct necessitated a jury instruction on reasonable doubt. *Id.* at 161. In *Paulson v. State*, 28 S.W.3d 570, 573 (Tex. Crim. App. 2000), the Court of Criminal Appeals overruled that portion of *Geesa* that required trial courts to instruct juries on the definition of "beyond a reasonable doubt." Since *Paulson*, the Court of Criminal Appeals has confirmed *Geesa*'s rejection of the analytical construct and reiterated that the correct standard of review for legal sufficiency review is the same in both direct and circumstantial evidence cases. The appellate court is to use the *Jackson v. Virginia* standard and examine all the evidence in the light most favorable to the verdict in order to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt.

Appellant was indicted for the offense of theft of over $1,500 and under $20,000, a state jail felony, in violation of Sections 31.03 and 31.09 of the Texas Penal Code. The offense was alleged to have occurred, pursuant to one scheme and continuing course of conduct, on various dates between April 19, 2005, and May 25, 2005. Viewed in a light most favorable to the verdict, the evidence was legally sufficient for the jury, as a rational trier of fact, to find that appellant committed theft of over $1,500 and under $20,000 as alleged in the indictment.

Hicks, the branch manager, testified that the branch had not had straps with missing amounts of cash before the period of appellant's employment nor had the branch had so many problems of missing cash. Clark testified that the major losses stopped when appellant was terminated. Dawson testified that she had never taken a strap of cash from the vault that was missing more than a minor amount; yet, on that day in May, the strap she took was missing $400. Other tellers then found that straps they received from the vault were missing another $3,000.

On June 2, the surprise cash count by Hicks and Byerly of appellant's drawer revealed a missing $5,000. Appellant had written $7,000 on her balancing sheet for June 1, but there was

only $2,000 in her drawer. Appellant's teller tapes were the only ones that had been cut or torn and then spliced back together, omitting transactions, even though the omitted transactions were listed as cash-outs at the end of the tape. The bank investigated but was unable to confirm that appellant's listed cash-outs (that had been cut from the tape) were valid transactions with a customer. The bank was also unable to verify a number of cash-outs on other daily tapes of appellant.

Campbell testified that there were a number of discrepancies on appellant's teller tapes. Appellant had prepared pink slips indicating that she gave cash to a customer; however, the hard copy of that ticket never went through the bank's proof department. The conclusion had to be that there was not an actual transaction with a customer. Campbell testified that the missing currency totaled $18,829.

The evidence was sufficient to support the verdict. The jury took one and one-half hours to render its verdict of guilt. Appellant's first issue is overruled.

*Appellant's Motion for Mistrial*

In appellant's second issue, she argues that the trial court abused its discretion in denying her motion for mistrial when the lead and sole investigator for the State, Chief Deputy Duvall, violated her motion in limine. Prior to trial, appellant was granted a motion in limine prohibiting the State from eliciting testimony "as to the truthfulness or untruthfulness of a witness, or an opinion as to the guilt or innocence of the [accused]."

During Chief Deputy Duvall's testimony concerning one of his interviews with appellant, he testified that he told appellant that "it was clear to [him] that she was not at all truthful in her responses." Appellant objected, asked for an instruction that the jury disregard the answer, and moved for a mistrial. The trial court sustained the objection, instructed the jury to disregard Chief Deputy Duvall's statement, but denied the motion for mistrial.

The trial court was correct in agreeing that the motion in limine was violated, in sustaining appellant's objection, and in instructing the jury to disregard the testimony. We disagree with the State's characterization that Chief Deputy Duvall was simply describing an interview technique.

We find, however, that the trial court did not abuse its discretion in denying appellant's motion for a mistrial. The granting of a mistrial is an extreme remedy for curing prejudice occurring at trial. *Bauder v. State*, 921 S.W.2d 696, 698 (Tex. Crim. App. 1996). A mistrial is

14

required only when the improper evidence or testimony is "clearly calculated to inflame the minds of the jury and is of such a character as to suggest the impossibility of withdrawing the impression produced on the minds of the jury." *Hinojosa v. State*, 4 S.W.3d 240, 253 (Tex. Crim. App. 1999). A trial court does not abuse its discretion when its decision is within the zone of reasonable disagreement. *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991).

After reviewing Chief Deputy Duvall's testimony in the context of all the testimony and evidence in the case, we find that the trial court's instruction to disregard cured any prejudicial effect associated with the improper answer. *See Ovalle v. State*, 13 S.W.3d 774, 783 (Tex. Crim. App. 2000). We presume that the jury followed the trial court's instructions to disregard the improper testimony. *Colburn v. State*, 966 S.W.2d 511, 520 (Tex. Crim. App. 1998). Appellant's second issue is overruled.

*This Court's Ruling*

The judgment of the trial court is affirmed.


TERRY McCALL

JUSTICE


October 13, 2011

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Wright, C.J.,
McCall, J., and Kalenak, J.